CONCORD CONSUMERS HOUSING COOPERATIVE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 31365-81.          Filed July 16, 1987.

*Robert W. Siegel*, for the petitioner.
*D. Marcus Carr*, for the respondent.

PARKER, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE Mar. 31— | Deficiency |
| --- | --- |
| 1976 | $4,399 |
| 1977 | 3,036 |
| 1978 | 3,865 |

---

After concessions[1] the issues remaining for decision are:

(1) Whether the interest petitioner earned on two reserve accounts and a mortgage escrow account required to be established pursuant to regulatory agreements with the Federal Housing Administration and the Michigan State Housing Development Authority constitutes income "derived * * * from members or transactions with members" (membership income) within the meaning of section 277(a);[2] and

(2) If not, and if such interest constitutes instead nonmembership income, whether any deductions are properly attributable to the production of such nonmembership income.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, as orally supplemented at trial, and the exhibits attached thereto are incorporated herein by this reference.

Petitioner Concord Consumers Housing Cooperative (hereinafter sometimes referred to as Concord) is a nonprofit, nonstock corporation incorporated on January 16, 1970, in accordance with the laws of the State of Michigan.[3] At the

---

[1]Respondent concedes that petitioner is entitled to the investment tax credit claimed for the taxable years ended Mar. 31,1976, and Mar. 31, 1978.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]The parties stipulated that petitioner "was incorporated on Jan. 16, 1970 as a cooperative housing corporation and was organized exclusively to provide housing facilities." However, petitioner has not contended that it is a "cooperative housing corporation" within the meaning of sec. 216, and the record does not contain the facts necessary for us to determine whether, during the years before the Court, petitioner satisfied the statutory requirements of sec. 216(b)(1) and the pertinent regulations. See *Eckstein v. United States*, 452 F.2d 1036 (Ct. Cl. 1971). Indeed, from the evidence in the record and from the parties' briefs, we cannot find that the parties attached any significance to the above-stipulated language. Since neither party contends that petitioner is a "cooperative" to which sec. 216 or subch. T applies, and since the facts in the record are not sufficient for us to conclude that petitioner is a "cooperative housing corporation" within the meaning of sec. 216(b)(1) or that petitioner is "operating on a cooperative basis" within the meaning of sec. 1381(a)(2), we attach no significance to the above-stipulated language in this case. In other cases, we have held that those provisions can apply to cooperative housing corporations. *Concord Village, Inc. v. Commissioner*, 65 T.C. 142 (1975); *Park Place, Inc. v. Commissioner*, 57 T.C. 767 (1972). The parties have neither cited nor relied upon those cases, possibly because the issues therein are not involved here. All the taxable years in those two cases preceded the enactment of sec. 277, and so neither of those

time the petition was filed in this case, petitioner's principal business office was located in Trenton, Michigan. Petitioner reports its income under the accrual method of accounting and on a fiscal year basis ending March 31. During the years in issue, petitioner filed its U.S. Corporation Income Tax Returns (Forms 1120) with the Internal Revenue Service Center at Cincinnati, Ohio.

Concord is a federally subsidized, nonprofit corporation organized exclusively to provide housing facilities for persons of low and moderate incomes and such social, recreational, commercial, and communal facilities as may be incidental or appurtenant thereto and, in general, to carry on any business in connection therewith and incidental thereto, with all powers conferred upon corporations by the laws of the State of Michigan but not inconsistent with Act No. 346 of Public Acts of 1966 of the State of Michigan, as amended.

Concord obtained mortgages from the Michigan State Housing Development Authority (MSHDA) and obtained mortgage insurance and the benefits of special financing through the Federal Housing Administration (FHA), Department of Housing and Urban Development (HUD), in accordance with section 236 of the National Housing Act, as amended.[4] MSHDA is the mortgagee on all the real property

---

cases involved the applicability of sec. 277 to cooperative housing corporations or to cooperatives generally. Both of those cases involved various forfeitures and payments from and "overassessments" as to members and whether such forfeitures, payments, and overassessments constituted contributions to capital, income to the corporation, or amounts available to be distributed to patrons and deducted as patronage dividends. Here, there is no question that the disputed interest constitutes income to petitioner, and here art. XII of petitioner's articles of incorporation expressly provides that "No dividend shall be paid at any time upon any membership issued by this corporation." Accordingly, our opinion below will be limited to sec. 277 and its application to the facts of this case, i.e., to the only issue pleaded, tried, and briefed by the parties. We leave to another day any exploration of the possible interrelationship and full sweep of secs. 216, 277, and subch. T.

[4]Sec. 236 was added to the National Housing Act by sec. 201 of the Housing and Urban Development Act of 1968, Pub. L. 90-448, 82 Stat. 498, 12 U.S.C. sec. 1715Z-1 (1982).

Sec. 236 was enacted to assist low and moderate income families in obtaining suitable rental and cooperative housing. Generally sec. 236 authorizes the Department of Housing and Urban Development (HUD) to issue mortgage insurance on mortgage loans for qualified sec. 236 projects and to pay, on behalf of the mortgagors, the mortgage insurance premiums and the interest on the mortgage loan over 1 percent. These interest payments, commonly referred to as interest reduction payments, reduce the total operating costs of a sec. 236 project by lowering, in effect, the rate of interest on the mortgage loan to 1 percent. The reduced operating costs enable the sec. 236 project to charge lower rents to its tenants. For a good overview of sec. 236, see *Graff v. Commissioner*, 74 T.C. 743 (1980), affd. 673 F.2d 784 (5th Cir. 1982). See also "Low Income Housing: Section 236 of the National Housing Act and the Tax Reform Act of 1969," 31 U. Pitt. L. Rev. 443 (1970).

owned by petitioner. In order to obtain these mortgages from MSHDA and to qualify under section 236 of the National Housing Act for Federal assistance, petitioner was required to enter into regulatory agreements with FHA. The regulatory agreements set forth extensive rules and regulations governing virtually every aspect of petitioner's activities. In the event petitioner fails to comply with the terms of the regulatory agreements, FHA, among other things, can institute mortgage foreclosure proceedings or any other appropriate legal proceeding and assume management of petitioner. Petitioner's members, who will be described below, elect their own boards of directors to conduct corporate activities. Corporate activity, however, is restricted by the terms and conditions of the regulatory agreements, which effectively provide FHA and MSHDA with the ultimate authority to regulate petitioner.

Concord was constructed in eight phases or sections. Seven sections contain 50 dwelling units each and the eighth section contains 41 units, for a total of 391 units. Separate mortgages were obtained from MSHDA for each section, and petitioner, and FHA executed separate regulatory agreements with respect to each section. These eight regulatory agreements were executed in the period from March 20, 1970, through June 9, 1971. The terms and conditions set forth in each of these regulatory agreements are essentially identical.

Occupancy in Concord is limited to those families whose incomes do not exceed the limits prescribed by the Federal Housing Commissioner (hereinafter referred to as the Housing Commissioner) with the exception of those occupants who agree to pay fair market rental value. However, preference is given to those families displaced from an urban renewal area, or as a result of governmental action, or as a result of a disaster determined by the President to be a major disaster, and to those families whose incomes are within the lowest practicable limits for obtaining membership in the project.

Membership in petitioner is limited to 391 members, i.e., one per unit. Each applicant for membership submits a certification of income and written evidence substantiating the information given on the certification. Memberships in

petitioner are sold at a cost of approximately $900 to $1,000.[5] After becoming a member, the individual is assigned a unit and pays rent for that unit commonly referred to as a "carrying charge."

With the prior approval of the Housing Commissioner, petitioner established for each dwelling unit a basic carrying charge and a fair market carrying charge. The basic carrying charge was determined on the basis of operating Concord with payments of principal and interest under a mortgage bearing interest at 1 percent. See note 4 *supra*. The fair market carrying charge was determined on the basis of operating Concord with payments of principal, interest, and mortgage insurance premiums due under the insured mortgage on the project. The amount of the basic carrying charges and the fair market carrying charges can be changed only with the approval of the Housing Commissioner.

Generally, the actual carrying charge to be collected for each unit is the greater of either the basic carrying charge or 25 percent of the member's income. However, in no event is the actual carrying charge collected greater than the fair market carrying charge. The regulatory agreements require petitioner to make a monthly report of any excess income and remit to the Housing Commissioner on a monthly basis the difference, if any, between the total carrying charges collected and the approved basic carrying charge per unit for all occupied units.

Sixty days prior to the beginning of each fiscal year, petitioner is required to prepare and submit a proposed operating budget to FHA for approval. This proposed operating budget is required to set forth the anticipated income of the project and a detailed estimate of expenses, including separate estimates for administration expense, operating expense, maintenance expense, utilities, hazard insurance, taxes and assessments, ground rent, interest and

---

[5]The articles of incorporation provide for 391 memberships at the initial cost of $100 each. However, sec. 8(d) of petitioner's bylaws provides a formula in determining transfer values of membership certificates with respect to subsequent purchasers. This formula takes into account the original purchase price, improvements made by previous tenants with the prior approval of the directors, and the amount of principal amortized by petitioner on its mortgage indebtedness and attributable at the discretion of the directors to the dwelling unit involved as paid by all holders, past and present, of the same membership. However, the first 3 years of principal payments on its mortgage indebtedness are not included in this computation.

amortization, mortgage insurance premium, replacement reserve, and operating reserve.

Most members of Concord also receive additional Federal assistance. As of the date of trial, 244 members of Concord were receiving a Federal subsidy under section 8, and 41 members of Concord were receiving a Federal subsidy under a rent supplement program.[6] The remaining 106 members were paying the basic carrying charge or rent. Section 8 is a subsidy provided by the Federal Government where the member pays a portion of the basic carrying charge, with the balance of the carrying charge paid by the Federal Government, specifically, HUD. The rent supplement program is similar to the section 8 subsidy in that the Federal Government, specifically, HUD, pays a portion of the member's basic carrying charge.

Members paying less than the fair market carrying charge are required to submit a recertification of income to petitioner at various intervals. Written evidence substantiating the information given on these recertifications is also required.

In accordance with the terms and conditions of the regulatory agreements, petitioner is required to establish two reserve funds, namely, a replacement reserve fund and a general operating reserve fund. The purpose of the replacement reserve fund is to make funds available to petitioner to replace structural elements and mechanical equipment of the project, such as stoves and refrigerators, roofing, or street repairs, and for other items of expense not specifically included in petitioner's annual budget. However, disbursements from this fund are permitted only after receiving the consent in writing from the Housing Commissioner.

---

[6]The record does not fully explain the particulars of either the sec. 8 program or the rent supplement program. We assume that the sec. 8 program refers to the housing assistance program provided by sec. 8 of the United States Housing Act of 1937 as amended by the Housing and Community Development Act of 1974, Pub. L. 93-383, 88 Stat. 653, 662, 42 U.S.C. sec. 1437(f) (1982). We also assume that the rent supplement program refers to the housing assistance program provided by sec. 101 of the Housing and Urban Development Act of 1965, as amended by sec. 202 of Pub. L. 90-448, 82 Stat. 503 (1968), 12 U.S.C. 1701(s) (1982).

Detailing the specifics of the rent supplement program and the sec. 8 program is not necessary for purposes of this case. Suffice it to say that each program provides additional Federal funds to certain families unable to pay the basic carrying charge for housing. At the time of trial, 285 of petitioner's 391 members were receiving assistance from HUD in paying the basic carrying charge established under the regulatory agreements.

The replacement reserve is funded by petitioner on a monthly basis in various amounts specified in each of the eight regulatory agreements. Each regulatory agreement provides a specific dollar amount that must be placed in the replacement reserve each month. The total annual payments required to be deposited into this fund for all eight regulatory agreements was $27,364.08 at the time the project began and had increased by the time of trial to $41,436. There is nothing in the record indicating that petitioner ever deposited any amount in excess of the required monthly payments.

Pursuant to the regulatory agreements, the mortgagee (MSHDA) managed and controlled the replacement reserve fund at all times. The regulatory agreements require this fund to be maintained either in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America. Any interest earned on these funds is credited to the replacement reserve account for petitioner's subsequent use in that petitioner submits bills it has paid for replacements and is reimbursed from the replacement reserve.

The regulatory agreements also require petitioner to establish and maintain a general operating reserve fund. Petitioner is required to contribute monthly to this fund in an amount not less than 3 percent of the monthly amounts otherwise chargeable to the members pursuant to their occupancy agreements. Three percent of the chargeable monthly amounts totals approximately $65,000 annually. Upon accrual in this fund of 15 percent of the current annual chargeable amounts, petitioner is permitted to reduce its contributions from 3 percent to 2 percent of the monthly chargeable amounts. However, in the event withdrawals from the general operating reserve reduce it below the 15-percent level, the rate of monthly deposits immediately reverts to the 3-percent rate. Upon accrual in this fund of 25 percent of the current annual chargeable amounts, petitioner is permitted to discontinue all deposits into this fund so long as the 25-percent level is maintained. There is nothing in the record indicating that petitioner ever deposited into this account any amount in excess of the required monthly payments or that the fund had ever

accrued the appropriate amounts to permit either a reduction in the monthly payments or to discontinue the payments entirely. Indeed, at the time of trial, petitioner's general operating reserve fund had a deficit in the amount of $51,800.

The purpose of the general operating reserve fund is to provide a measure of financial stability during periods of special stress and to meet deficiencies from time to time as a result of delinquent member payments. In addition, the fund is used to repurchase membership certificates of withdrawing members, and for other contingencies. Disbursements totaling in excess of 20 percent of the total balance in the reserve as of the close of the preceding annual period may not be made during any annual period without the consent of the Housing Commissioner. Upon payment of tenants' delinquencies or the sale of membership certificates for which funds were withdrawn, such amounts are required to be redeposited in the general operating reserve fund.

Unlike the replacement reserve fund, the general operating reserve fund was under petitioner's control (or the control of its management company) at all times. However, similar to the replacement reserve fund, the regulatory agreements require this fund to be maintained either in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America.

Petitioner's management company actually runs the housing project. As part of its many responsibilities, that company manages the general operating reserve for petitioner, maintaining the funds in the form of insured bank deposits, Treasury bonds, and Treasury bills in accordance with the regulatory agreements. Any interest earned on these funds is credited to the general operating reserve for petitioner's subsequent use. However, part of the interest is used to pay the management company's annual fee.

Petitioner's management company also makes monthly mortgage payments to MSHDA on petitioner's behalf. Part of each payment is placed in a mortgage escrow account established and maintained by MSHDA for the subsequent payment of petitioner's real estate taxes and insurance. The

mortgage escrow account is an interest-bearing account and the interest earned is credited to the account and used solely to pay petitioner's real estate taxes and insurance. No part of this interest is accessible to petitioner for its general operating expense and no part is used to pay the management company's annual fee. The management company's annual fee is related to the replacement reserve fund and the general operating reserve fund in the sense that the company's fee includes a certain percentage of the interest earned on those reserve funds, but does not include a percentage of the interest earned on the mortgage escrow account.

Petitioner's present management company began managing petitioner in April of 1978, subsequent to the years before the Court.[7] In addition to Concord, this company manages approximately nine other housing organizations such as Concord. The company performs various services for Concord including collecting and posting the monthly rent payments to member's cards, depositing funds, preparing monthly cash-flow statements for HUD and MSHDA, and maintaining petitioner's books. The company also invests funds on petitioner's behalf, assures that the general operating reserve is properly maintained, attends board meetings, obtains bids on repairs, supervises the maintenance department and supervises membership resales and recertifications. In addition, a property manager visits the premises twice a week.

In total, the management company devotes approximately 980 hours each year to managing Concord. About 100 hours of this time is related to the interest income generated by the escrow and reserve accounts, particularly the general operating reserve fund. These services include preparing the cash-flow statements, making reports to the board of

---

[7]Mr. and Mrs. Alphonse Marcus are the principals of the present management company. Mr. Marcus testified at the trial, but there was no testimony by anyone connected with the management company that served in that capacity during the years before the Court. While Mr. Marcus testified that he thought his company's activities and the time his company spent on Concord's work were representative of that of the predecessor company, he had no personal knowledge as to the earlier years. We have made findings based on Mr. Marcus' testimony, but the weight that can properly be accorded to it is lessened by his lack of personal knowledge. However, since Mr. Marcus performs similar services for nine other housing organizations such as Concord and since the State and Federal regulatory requirements give some assurance of reasonable consistency in administrative practices, we think his testimony is entitled to some weight.

directors, reviewing investments, making requests to withdraw moneys, reconciling interest, checking interest rates at various banks, and on occasion, changing banks and making requests for reimbursement from the replacement reserve fund. Petitioner's management company receives annually, as part of its management fee, an amount equal to 4.5 percent of the interest earned on petitioner's two reserve accounts.

For its taxable years ended March 31, 1976, 1977, and 1978, petitioner claimed deductions for management fees in the amounts of $41,005, $43,293, and $52,457, respectively. Petitioner also incurred audit fees of $2,800 in each of those years.

In obtaining its eight mortgages, petitioner incurred a financing cost totaling $277,645 which it is amortizing over 40 years, in the amount of $6,941 per year. In addition, petitioner incurred organizational costs at its inception totaling $213,049 for legal and accounting fees and is amortizing this amount over 40 years also, in the amount of $5,326 per year.

During petitioner's taxable years ended March 31, 1976, 1977, and 1978, interest earned on the two reserve funds and the mortgage escrow account totaled $21,997, $15,181, and $19,324, respectively. For the taxable year ended March 31, 1976, the record does not provide a breakdown of the interest earned with respect to these individual accounts. For the other two years, the breakdown is as follows:

| TYE Mar. 31— | Replacement reserve | General operating reserve | Mortgage escrow account | Total |
|---|---|---|---|---|
| 1977 | $7,991 | [1]($602) | $7,792 | $15,181 |
| 1978 | 8,016 | 4,432 | 6,876 | 19,324 |

[1]Negative figure because overstated by $3,500 in the preceding year.

Petitioner reported these amounts of interest as income in these years. On its U.S. Corporation Income Tax Returns (Forms 1120) for its taxable years ended March 31, 1976 and 1977, petitioner reported total gross income of $686,773 and $753,021 and total deductions of $854,672 and $925,857, respectively, resulting in a substantial loss each year. Petitioner did not specifically allocate any of the deductions to its interest income. On its U.S. Corporation

Income Tax Return (Form 1120) for its taxable year ended March 31, 1978, petitioner reported interest income of $19,324 as outside (nonmember) income and specifically allocated deductions totaling $29,639 to this income resulting in a loss of $10,315 for such year. Petitioner allocated the entire annual amortization for finance cost ($6,941) and for organization cost ($5,326), for a total of $12,267 to the interest income. Petitioner also allocated $10,491 of the management fee, $3,811 of the legal fee, and $3,070 of the audit and tax appeal fee, for a total of $17,372, to the interest income.

In a statutory notice of deficiency dated September 30, 1981, respondent determined that the interest on the replacement reserve fund, the general operating reserve fund, and the mortgage escrow account during each of the years in issue constituted nonmember or nonmembership income within the meaning of section 277. Respondent further determined that petitioner failed to establish that its expenses, or any portions thereof, deducted on its tax returns were attributable to this nonmembership interest income. Respondent thus increased petitioner's taxable income for each of the years in issue by the amounts of this interest income, $21,997, $15,181, and $19,324, respectively.[8]

OPINION

Petitioner is a nonexempt, nonprofit corporation organized exclusively to provide housing for persons of low and moderate incomes. As such, petitioner qualifies for and receives the benefits of special mortgage financing afforded by section 236 of the National Housing Act, as amended. During the years in issue, petitioner earned and reported as income interest on two reserve accounts and a mortgage escrow account. However, each year petitioner's expenses exceeded its income (including this interest income). Thus, petitioner reported a loss in each year and paid no tax with respect to the interest earned on these accounts.

[8]Respondent also determined that petitioner failed to establish that the net operating losses (NOL's) in prior years or any portions thereof were attributable to nonmembership income. Accordingly, respondent determined this nonmembership interest income could not be reduced by those NOL's.

We must determine whether the interest earned on those three accounts constitutes "income derived * * * from members or transactions with members" (hereinafter sometimes referred to as member income or membership income) within the meaning of section 277. If we conclude that such interest constitutes nonmember or nonmembership income (income *not* derived from members or transactions with members), then we must determine what deductions, if any, are properly attributable thereto.

Section 277(a) provides:[9]

SEC. 277(a). GENERAL RULE.—In the case of a social club or *other membership organization which is operated primarily to furnish services or goods to members* and which is not exempt from taxation, *deductions* for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members *shall be allowed only to the extent of income derived during such year from members or transactions with members* (including income derived during such year from institutes and trade shows which are primarily for the education of members). If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year. The deductions provided by sections 243, 244, and 245 (relating to dividends received by corporations) shall not be allowed to any organization to which this section applies for the taxable year. [Emphasis added.]

Section 277(a) is a deduction deferral, not a deduction disallowance provision. Generally, this section applies to nonexempt membership organizations which are operated primarily to furnish services or goods to their members.[10] This provision limits deductions (attributable to furnishing services, goods, or other items of value to members) to the extent of membership income. However, those deductions disallowed in one year can be used in the succeeding year to offset membership income. The effect of section 277 is to prevent taxable membership organizations from avoiding tax on nonmembership income by operating membership activities at a loss and using this loss to offset the

---

[9]Sec. 277(b) excepts certain organizations from the general rule under subsec. (a). None of those exceptions are applicable herein.

[10]No issue has been raised in this case as to petitioner's status as a membership organization operated primarily to furnish services or goods to its members within the meaning of sec. 277. Indeed, petitioner has never contended otherwise, and the record does not suggest that petitioner is other than an organization described in sec. 277. See *Associated Barbers & Beauticians v. Commissioner*, 69 T.C. 53, 70-75 (1977).

nonmembership income. *Associated Barbers & Beauticians v. Commissioner*, 69 T.C. 53, 70-75 (1977).

Respondent essentially takes the position that interest earned by an organization described in section 277 necessarily constitutes investment income and is properly characterized as nonmembership income. Petitioner contends that Congress never intended such a blanket rule to apply to section 277 organizations. Rather, relying on the legislative history, petitioner argues that we should construe nonmembership income under section 277 similar to "unrelated business taxable income" as that term is construed under section 513 and the regulations thereunder. As such, membership income should be defined, according to petitioner, to include all income received from sources substantially related to the function of the organization. Petitioner points to the fact that the interest in this case was earned on accounts required to be maintained pursuant to the terms of the FHA and MSHDA regulatory agreements. Thus, petitioner contends the income on those accounts was derived from sources substantially related to its function and is therefore properly characterized as membership income under section 277.

Unfortunately, the term "income derived * * * from members or transactions with members" is not defined in the Code, and regulations under section 277 have yet to be promulgated.[11] Moreover, the parties have not cited and we have not found any case wholly dispositive of the issue herein.[12] Our opinion in *Associated Barbers & Beauticians v. Commissioner, supra*, concluded that interest income on United States Savings Bonds and Treasury Notes was nonmembership income, but the main thrust of that opinion was the status of the taxpayer as a membership organiza-

---

[11]Proposed regulations under sec. 277 were issued in May of 1972. However, respondent announced in a News Release dated Dec. 9, 1986, the closing of 133 regulation projects. One of the projects listed was project No. LR 721-71 pertaining to sec. 277. Thus, whether the proposed regulations under this section will ever be promulgated in final form is uncertain.

In any event, proposed regulations carry no more weight than a position or argument advanced on brief. See *Freesen v. Commissioner*, 84 T.C. 920, 939 (1985), revd. on other grounds 798 F.2d 195 (7th Cir. 1986), quoting *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265-1266 (1970). Moreover, the proposed regulations provided no assistance in the resolution of the instant case.

[12]We note that in *Shore Drive Apartments, Inc. v. United States*, an unreported case (M.D. Fla. 1976, 38 AFTR 2d 76-5916, 76-2 USTC par. 9808), the District Court on cross-motions for summary judgment held without discussion or analysis that interest earned on investments in United States obligations was not membership income within the meaning of sec. 277(a).

tion vel non. Also, petitioner tries to distinguish that case on the ground that the investments therein were voluntary, whereas, in this case, they were compelled by the regulatory agreements. We think that factor is not determinative. In any event, we will look to the language of the statute and its legislative history to construe the term so as to give effect to congressional intent. *United States v. American Trucking Association,* 310 U.S. 534, 542-544, rehearing denied 311 U.S. 724 (1940).

Section 277 was enacted into law by section 121 of the Tax Reform Act of 1969 (TRA 69), Pub. L. 91-172, 83 Stat. 537, in connection with the extensive revisions made to the unrelated business income tax provisions. Generally, the unrelated business income tax is a tax imposed on the income of a tax-exempt organization, which is generated by a trade or business, regularly carried on, and not substantially related to the organization's tax-exempt purpose. *United States v. American College of Physicians,* 475 U.S. 834 (1986), (57 AFTR 2d 86-1182, 86-1 USTC par. 9339); *United States v. American Bar Endowment,* 477 U.S. 105 (1986), (58 AFTR 2d 86-5190, 86-1 USTC par. 9482). Prior to 1969, many tax-exempt organizations were not subject to the unrelated business income tax. However, with few exceptions TRA 69 extended the unrelated business income tax to virtually all tax-exempt organizations since these organizations, which were previously entirely exempt from tax, were "equally apt to engage in unrelated business." H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 230.

Simply extending the coverage of the "unrelated business income tax" did not address the particular problem with respect to investment income of "organizations which are exempt on the grounds of mutuality or common membership." H. Rept. 91-413, *supra,* 1969-3 C.B. at 231. Since investment income generally is not derived from a trade or business and thus not subject to the unrelated business income tax, the investment income generated by various tax-exempt membership organizations was generally exempt from tax. Congress reasoned that the tax exemption provided for these organizations, such as social clubs, was originally "designed to allow individuals to join together to provide recreational or social facilities or other benefits on a

mutual basis, without tax consequences." H. Rept. 91-413, *supra*; S. Rept. 91-552 (1969), 1969-3 C.B. 469. As such, "the tax exemption operates properly only when the sources of income of the organization are limited to receipts from the membership * * * where the organization receives income from sources outside the membership, such as income from investments, upon which no tax is paid, the membership receives a benefit not contemplated by the exemption in that untaxed dollars can be used * * * to provide pleasure or recreation to its membership." H. Rept. 91-413, *supra*; S. Rept. 91-552, *supra*, 1969-3 C.B. at 469-470.

In order to prevent certain tax-exempt membership organizations from escaping tax on their investment and other nonmember income, Congress added section 512(a)(3). Sec. 121 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 537. Section 512(a)(3) extends the definition of "unrelated business taxable income" to include all income that is not "exempt function income." As originally enacted,[13] section 512(a)(3) provided as follows:

(3) SPECIAL RULES APPLICABLE TO ORGANIZATIONS DESCRIBED IN SECTION 501(c)(7) or (9).—

(A) GENERAL RULE.—In the case of an organization described in section 501(c)(7) or (9), the term "unrelated business taxable income" means the gross income (excluding any exempt function income), less the deductions allowed by this chapter which are directly connected with the production of the gross income (excluding exempt function income), both computed with the modifications provided in paragraphs (6), (10), (11), and (12) of section (b).

(B) EXEMPT FUNCTION INCOME.—For purposes of subparagraph (A), the term "exempt function income" means the gross income from dues, fees, charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid. Such term also means all income (other than an amount equal to the gross income derived from any unrelated trade or business regularly carried on by such organization computed as if the organization were subject to paragraph (1)), which is set aside—

(i) for a purpose specified in section 170(c)(4), or

(ii) in the case of an organization described in section 501(c)(9), to provide for the payment of life, sick, accident, or other benefits,

---

[13]Sec. 512(a)(3) remains substantially the same today, except for expansion to include organizations described in sec. 501(c)(17) and (20), and a new sentence at the end of sec. 512(a)(3) relating to dividends received by corporations.

including reasonable costs of administration directly connected with a purpose described in clause (i) or (ii). If during the taxable year, an amount which is attributable to income so set aside is used for a purpose other than that described in clause (i) or (ii), such amount shall be included, under subparagraph (A), in unrelated business taxable income for the taxable year.

Organizations described in section 512(a)(3) are thus taxed on all income other than that received from members in exchange for goods and services and other than that income specifically exempted by section 512(a)(3)(B)(i) or (ii). Thus, to be taxable, the income of these organizations need not be generated by a "trade or business." Consequently, interest earned on investments, unless specifically exempted by section 512(a)(3)(B)(i) or (ii), is "unrelated business taxable income" within the meaning of section 512(a)(3), regardless of whether such income is substantially related to the organization's exempt purpose. In addition, deductions attributable to the organization's exempt-function income cannot be used to offset its unrelated business taxable income.

The enactment of section 512(a)(3) prompted Congress to enact section 277. Congress was aware that certain nonexempt membership organizations were using their investment income and nonmember income to offset the cost of providing services to their members, which in some instances rendered their investment income totally nontaxable:

Certain nonexempt corporations organized to provide services to members on a nonprofit basis realize investment income, or income from providing services to nonmembers, which is used to defray all or part of the cost of providing services to members. The courts have upheld this treatment in certain cases, although the effect is to render the investment income nontaxable, and therefore to permit untaxed dollars to be used by the organization to provide services for its members. [H. Rept. 91-413 (Part 1)(1969), 1969-3 C.B. 232.]

Virtually identical concerns were expressed in the Senate Report. S. Rept. 91-552 (1969), 1969-3 C.B. 471. In addition, the concern was also expressed that without a specific provision to deal with investment and nonmember income of nonexempt membership organizations, those tax-exempt organizations governed under newly enacted section 512(a)(3) might attempt to avoid its effect "in treating

investment income and income received from nonmembers as unrelated business income by giving up their exempt status and deducting the cost of providing services for members against this income." H. Rept. 91-413, *supra*, 1969-3 C.B. at 232.[14]

In response, Congress enacted section 277. The purpose of section 277 was "to prevent [taxable] membership organizations from escaping tax on business or investment income by using this income to serve its members at less than cost and then deducting the book 'loss.' " S. Rept. 91-552 (1969), 1969-3 C.B. 471.

The effect of section 277 for nonexempt organizations is essentially the same as the effect of section 512(a)(3) for exempt organizations. Both sections prevent their respective organizations from escaping tax on their investment income and nonmember income by offsetting such income with losses incurred in providing goods and services to members.[15] The purpose of section 512(a)(3) is accomplished by defining unrelated business taxable income to mean all income that is not "exempt function income," less the deductions allowed which are directly connected with the production of such income (excluding exempt-function income). The purpose of section 277 is accomplished by simply limiting deductions in any taxable year for expenses incurred in providing goods and services to members to the extent of the "income derived during such year *from* members or transactions *with* members." We have found nothing to indicate that Congress intended that phrase to include all income from sources substantially related to the function of the organization, as petitioner contends. Indeed,

---

[14]The same concern was reiterated as an argument in favor of the enactment of sec. 277 in the Summary of H.R. 13270, Tax Reform Act of 1969, prepared by the staffs of the Joint Committee on Internal Revenue Taxation and the Committee on Finance, 91st Cong., 1st Sess. 30 (Comm. Print 1969):

(2) This provision is necessary to prevent exempt membership organizations from attempting to avoid the effect of the unrelated business income rule by giving up their exempt status and deducting the cost of providing services for members from its investment or nonmembership income.

[15]The Summary of H.R. 13270, Tax Reform Act of 1969, prepared by the staffs of the Joint Committee on Internal Revenue Taxation and the Committee on Finance, 91st Cong., 1st Sess. 30 (Comm. Print 1969), provides the following argument in support of sec. 277:

(1) To permit a membership organization to offset investment or business income against a loss arising from services provided to members is the same as if an individual were allowed to offset his personal or recreational expenses against his investment income.

the plain language of section 277 precludes us from reaching such a conclusion. Petitioner has not cited and we have not found any authority for deviating from the plain language of the statute.

In addition, because of the nexus between section 277 and section 512(a)(3) and the similar concerns Congress expressed with respect to investment income and other nonmember income of both tax-exempt and taxable membership organizations, we conclude that Congress did not intend taxable organizations described in section 277 to be treated more favorably than tax-exempt organizations described in section 512(a)(3).[16] For purposes of section 512(a)(3), "unrelated business taxable income" includes all investment income except limited amounts specifically excluded by section 512(a)(3)(B)(i) or (ii), and investment income cannot be offset by expenses of providing goods and services to members. We think it necessarily follows that all investment income constitutes nonmembership income within the meaning of section 277. It would indeed be anomalous to hold investment income constitutes "unrelated business taxable income" for purposes of section 512(a)(3), but in some instances constitutes membership income for purposes of section 277. Such an interpretation would thwart the underlying congressional intent of both section 512(a)(3) and section 277. Accordingly, based on the plain language of section 277 and its legislative purpose, we conclude that since the interest income earned and credited to petitioner's replacement reserve, general operating reserve, and mortgage escrow account was not received *from* members or transactions *with* members, such income consti-

---

[16]The nexus between sec. 512(a)(3) and sec. 277 is seen again in 1976 when Congress added essentially identical amendments to each section.

In 1976, Congress amended sec. 512(a)(3)(A) to prevent the use of the deductions provided by secs. 243, 244, and 245 (relating to dividends received by corporations) in computing unrelated business taxable income as defined in that section. Pub. L. 94-568, sec. 1(b), 90 Stat. 2697 (Oct. 20, 1976). See note 13 *supra*. Congress also enacted a similar amendment to sec. 277(a) which stated "The deductions provided by sections 243, 244 and 245 (relating to dividends received by corporations) shall not be allowed to any organization to which this section applies for the taxable year." Pub. L. 94-568, sec. 1(c), 90 Stat. 2697 (Oct. 20, 1976). See *Rolling Rock Club v. United States*, 785 F.2d 93 (3d Cir. 1986).

Congress was concerned that without a similar provision in sec. 277, tax-exempt organizations defined in sec. 512(a)(3) could avoid tax on this dividend income by simply giving up their tax-exempt status. H. Rept. 94-1353, to accompany H.R. 1144 (Pub. L. 94-568), 94th Cong., 2d Sess. 7 (1976), S. Rept. 94-1318, to accompany H.R. 1144 (Pub. L. 94-568), 94th Cong., 2d Sess. 7 (1976).

tutes nonmembership income within the meaning of section 277.[17]

Having concluded that the interest petitioner earned on the replacement reserve, the general operating reserve, and the mortgage escrow account is nonmembership income, we must now determine what deductions, if any, are attributable to this nonmembership income.

Petitioner incurred the following expenses during the years in issue and the parties agree that a portion of each expense is attributable to the interest generated on the above accounts:

| TYE Mar. 31— | Management fee | Amortized mortgage finance costs | Amortized organizational costs | Audit fee | Total |
|---|---|---|---|---|---|
| 1976 | $41,005 | $6,941 | [18]$5,069 | $2,800 | $55,815 |
| 1977 | 43,293 | 6,941 | 5,069 | 2,800 | 58,103 |
| 1978 | 52,457 | 6,941 | 5,326 | [19]2,800 | 67,524 |

The portion of each expense properly allocable to the nonmembership income each year naturally is in dispute. Petitioner argues that 10 percent of the management fee, the amortized mortgage finance costs and organizational costs, and 20 percent of the audit fee are properly allocable

[17]Citing *Land O'Lakes, Inc. v. United States*, 675 F.2d 988 (8th Cir. 1982), petitioner invites us to consider cases under subch. T in defining "membership income" for purposes of sec. 277. We decline the invitation. Recently we have had occasion to explore thoroughly the matter of patronage sourced income for cooperatives, i.e., income "from business done with or for its patrons" under sec. 1388(a). *Illinois Grain Corp. v. Commissioner*, 87 T.C. 435 (1986), on appeal (7th Cir., Mar. 2, 1987); *Certified Grocers of California, Ltd. and Subsidiaries v. Commissioner*, 88 T.C. 238 (1987). Subch. T provides a comprehensive framework for taxation of cooperatives. Petitioner does not contend that it comes within subch. T. Suffice it to say that we are not prepared to say that "income derived * * * *from* members or transactions *with* members" under sec. 277 has the same meaning as income "from business done with or *for* its patrons" under sec. 1388(a). See *Washington-Oregon Shippers Cooperative, Inc. v. Commissioner*, T.C. Memo. 1987-32, n. 13.

Petitioner also cites *Farm Service Cooperative v. Commissioner*, 70 T.C. 145, 156 (1978), revd. on cooperative issue 619 F.2d 718 (8th Cir. 1980), and overruled by this Court on that point in *Certified Grocers of California, Ltd. v. Commissioner*, *supra*. Relying on our passing comment on sec. 277 in that case, petitioner insists it does not come within the purpose of sec. 277 to disallow only intentional and sham losses. The sec. 277 issue in *Farm Service Cooperative* was decided on respondent's failure of proof, and our brief reference to sec. 277 therein did not purport to analyze the full range of sec. 277 in its proper sphere.

[18]The record is unclear as to why petitioner claimed $5,069 for amortized organizational costs in 1976 and 1977 when the total cost of $213,049 amortized over 40 years results in annual allowances of $5,326 as claimed in 1978. In any event, we have used the amounts petitioner reported.

[19]In 1978, petitioner incurred an expense in excess of $12,000 relating to a tax appeal. However, since this tax appeal involved local property taxes, we conclude that no part of this expense is properly allocable to nonmembership income.

to the nonmembership interest income.[20] Respondent requested the Court to find that only 3 percent of management and auditing fees and 2 percent of organizational and financing cost are properly allocable to such income, but on brief respondent contended for a range of 1 to 5 percent of each expense.

Unfortunately, neither the management company nor petitioner's accountant maintained a separate accounting of the expenses attributable to petitioner's nonmembership interest income. Petitioner's allocation of these expenses is primarily based upon the testimony of Alphonse Marcus, a principal of the management firm, and John Gwizdala, petitioner's accountant.

At trial, Mr. Marcus gave his best estimate of the time his company devoted to the three interest-bearing accounts. However, his company did not work for petitioner during the years before the Court. See note 7 *supra*. Mr. Gwizdala gave his opinion with respect to the organizational costs, the finance costs, and the auditing fee, that he considered properly allocable to the three interest-bearing accounts. While both witnesses appeared credible,[21] petitioner did not offer and there is nothing in the record setting forth the underlying factual data that each witness relied upon. Consequently, we are reluctant to make an allocation based solely on their unsupported conclusions.

However, when a taxpayer proves that some part of an expenditure was made for deductible purposes and when the record contains sufficient evidence for us to make some reasonable approximation, we will do so. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). Although the evidence is less than satisfactory for this purpose, we will do our best with the materials at hand "bearing heavily * * * upon the

---

[20]Petitioner understandably no longer seeks 20 percent of the management fee and 100 percent of the finance cost, organizational cost, and audit fee, as claimed on the 1978 tax return. We agree with respondent that those amounts were unreasonable.

[21]Here, as is generally the case with opinion evidence, credibility is not the issue. As we have had occasion to note:

"The Court's task is to determine the credibility of any lay or expert witness based upon objective facts, the reasonableness of the testimony, the consistency of the statements made by the witness, and, in some cases, the demeanor of the witness. In the present case, as in the ordinary case, any doubts about the reliability of an expert's testimony are based on the failure of the facts to support his assumptions and his ultimate opinion rather than any doubt as to whether the expert is expressing a truthful opinion. [*Estate of Fittl v. Commissioner*, T.C. Memo. 1986-452, 52 T.C.M. 567, 571, 55 P-H Memo T.C. par. 86,452 at 2097-2098.]"

taxpayer whose inexactitude is of his own making." *Cohan v. Commissioner*, 39 F.2d at 543-544.

There is no dispute in this case as to the amounts that petitioner expended during the years in issue with respect to its amortized organizational costs and finance costs, management fees, and auditing fees. Moreover, there is no dispute in this case that some portion of each expense is allocable to the nonmembership interest income. Accordingly, based on all the facts and circumstances, but bearing heavily against petitioner for the inexactitude of its evidence, we conclude that 5 percent of each of the above expenses is properly allocable to the nonmembership income and petitioner is entitled to deduct such amounts in each of the years in issue.

To reflect the parties' stipulation and our holdings,[22]

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, CHABOT, NIMS, WHITAKER, HAMBLEN, COHEN, SWIFT, GERBER, WRIGHT, PARR, and WELLS, *JJ.*, agree with the majority opinion.

---

KÖRNER, *J.*, concurring: I concur in the result which the majority has reached in this case, based upon the facts as

---

[22]We are satisfied that our treatment of investment income under sec. 277 is compelled by the statutory language, congressional intent, and the underlying legislative history. However, the interest generated by the various accounts in this case appears to have benefited HUD more than petitioner's members. The interest was used to defray a portion of petitioner's overall operating costs. Since HUD pays part of the basic carrying charges ("rent") for 285 of petitioner's members, that portion of the defrayed operating costs attributable to these members would appear to lower the financial assistance payments from HUD with respect to these members. On the other hand, the tax liability resulting from our holding necessarily increases petitioner's operating costs, and the increase attributable to the 285 members receiving Federal assistance in paying their basic charges will apparently be paid by HUD.

At least one commentator takes the position that for purposes of sec. 277, investment income is nonmember income, regardless of whether the generating funds are member contributions. However, he also suggests an exception might be made with respect to interest earned on cash reserves required by the FHA as a condition of obtaining mortgage insurance. See Miller, "Section 277: Guardsman or Marauder?" 10 J. Real Est. Tax. 370, 374 (1983). While good policy reasons may exist for creating such an exception, it is not the function of a court to rewrite or amend a statute in the guise of construing it. *David Metzger Trust v. Commissioner*, 76 T.C. 42, 59-60 (1981), affd. 693 F.2d 459 (5th Cir. 1982), cert. denied 463 U.S. 1207 (1983). If Congress sees a need to exempt the interest earned by housing organizations such as petitioner, it can do so.

found, but I think it desirable to add a few comments so that the majority opinion herein will not be misinterpreted.

The majority opinion, in footnote 3, refuses to find that this petitioner either is a cooperative organization within the meaning of section 216, or within the meaning of subchapter T of the Code, and therefore does not consider the applicability of those provisions of law to this case. I agree that section 216 has no application to this case, not because the record will not support a holding that this petitioner is a section 216 cooperative (it may or may not be), but because it is irrelevant. Section 216 deals only with certain taxes, interest, and depreciation expense which may be deducted by a *tenant stockholder* of a housing cooperative. None of those persons are before us as petitioners, and none of those items are in dispute in this case. Thus, this case can be decided without any reference to section 216, or petitioner's qualification thereunder.

The application of subchapter T to this case, however, is a different matter. If this petitioner was being operated on the cooperative basis, within the meaning of section 1381(a)(2), then the provisions of subchapter T attach, and petitioner's liability is to be determined under those provisions *as a matter of law*. The application of subchapter T is not elective on the part of either petitioner or respondent. Neither party can avoid the application of the correct law to the facts of the case by failing to plead or argue it. That is the province of the Court. See *Park Place, Inc. v. Commissioner*, 57 T.C. 767, 769 (1972). We have previously held that low income nonprofit housing corporations, *which concededly were cooperatives*, are governed by subchapter T, and that those Code provisions preempt other more general Code provisions which otherwise might be applicable. *Concord Village, Inc. v. Commissioner*, 65 T.C. 142 (1975); *Park Place, Inc. v. Commissioner, supra*.

Here, the majority avoids the question of the applicability of subchapter T by specifically refusing to find that petitioner was operated on the cooperative basis, for lack of adequate facts. There is certainly some support for the proposition that this petitioner was not operated on the cooperative basis, in that the findings of fact would suggest that there is no possibility that any margins or savings

which petitioner might realize could ever be rebated to the tenant members of the corporation as patronage refunds. The obligation of the organization to rebate to the patron member, on a patronage basis, the excess of its charges collected from the member over its actual costs of operation, and the right of the patron member to receive such distributions, is the principal factor which distinguishes cooperatives from other forms of business organization, and is the sine qua non of operating on the cooperative basis. See I. Packel, The Organization and Operation of Cooperatives 186-187, 252 (4th ed. 1970).[1]

Giving proper deference to the trial judge as the finder of facts in this case, I thus concur in the result reached by the majority here, as long as it is clear, as I think it should be, that we are *not* holding that the provisions of section 277 supersede the provisions of subchapter T in a case where the latter provisions apply. In such a case, I think a different analysis would be required, with at least the possibility that a different result might be reached. Compare *Certified Grocers of California, Ltd. v. Commissioner*, 88 T.C. 238 (1987); *Illinois Grain Corp. v. Commissioner*, 87 T.C. 435 (1986), on appeal (7th Cir., Mar. 2, 1987).

WHITAKER, HAMBLEN, JACOBS, WRIGHT, PARR, and WILLIAMS, *JJ.*, agree with this concurring opinion.

---

[1]Art. XII of petitioner's articles of incorporation, quoted in note 3 of the majority opinion, is not relevant to a determination of this question, since patronage refunds made by a cooperative to its members are not "dividends" at all, either under general law or under sec. 316.