**LANDMARK, INC., and its Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 375–87 T.**

United States Claims Court.

Jan. 10, 1992.

Sue Ann Nelson, St. Paul, Minn., for plaintiff. Ralph K. Morris, St. Paul, Minn., and Mark C. Stewart, Delaware, Ohio, of counsel.

Terry T. Coles, with whom were Asst. Atty. Gen. Shirley D. Peterson and Mildred L. Seidman, Dept. of Justice, Washington, D.C., for defendant.

OPINION

WIESE, Judge.

Plaintiff is a corporation operating on a cooperative basis under the provisions of subchapter T of the Internal Revenue Code

of 1954, 26 U.S.C. §§ 1381–1388 (1984).[1] In the tax year 1981, plaintiff suffered an ordinary loss of $9.9 million arising out of the sale of a refinery acquired in the mid 1970s (during the period of fuel shortages) to provide its membership with a reliable supply of petroleum. In its reporting of this loss for federal income tax purposes, Landmark identified $3.3 million as a deduction against income for 1981; the balance was claimed as a loss carryback to the years 1978–1980. The carryback reduced taxable income for the years 1978–1980 thus "freeing-up" investment tax credits previously claimed in those years. These displaced investment tax credits, in turn, were carried back to Landmark's tax years 1975–1977, resulting in a claimed overpayment of income tax for these earlier years in the respective amounts of $317,749.50, $730,018.00, and $113,148.00. It is the recovery of these amounts, together with interest as provided by law, that occasions this lawsuit.

Plaintiff's refund demand, which is before us now on cross-motions for summary judgment, raises two questions each related to the loss carryback treatments described above. The first centers on section 277 of the tax code, in particular, the restriction against loss carryback which that section prescribes for deductions claimed by a "social club or other membership organization" in respect to losses incurred in furnishing services, insurance, goods or other items of value to members. The specific question is whether section 277 applies to a cooperative operating under the provisions of subchapter T.

Assuming the answer to this question is no, then the second question we come to is whether, on the facts of this case, plaintiff must adhere to the requirement of section 46(h) of the tax code. That section requires a cooperative to allocate a taxable year's unused investment tax credits to its patrons[2] rather than use those credits as carrybacks to an earlier year.

Both issues have been briefed by the parties and oral argument was heard on November 26, 1991. We now conclude that plaintiff is not subject to the requirements of section 277; hence, it is entitled to a carryback of the unused portion of the ordinary loss suffered in 1981. We also conclude that plaintiff is required to adhere to the requirements of section 46(h); hence, it may not carryback its freed-up investment tax credits, but must instead pass them on to its patrons.

## FACTS *

The Landmark cooperative system is an integrated marketing, manufacturing and wholesale supply network system that extends the operations of some 80,000 farmers and related suppliers to the world's international export markets.

The Landmark system consists of four parts. First are the 80,000 farmers who own class A common stock in their local Landmark cooperative. Second are the 44 local Landmark cooperative organizations located throughout Ohio. Third is the regional Landmark cooperative, based in Columbus, Ohio and owned by the local cooperatives. Fourth are the inter-regional cooperatives located throughout the United States and owned in part by Landmark and other regional cooperatives.

Control of the local Landmark cooperative is vested in the local membership which elects a board of directors to set policy for the organization. Control of Landmark, Inc. Columbus (the regional cooperative) is vested in ten directors. Nine directors are elected on a one member-one vote basis by the 44 member associations and one director is appointed by the Ohio

---

1. The years in suit antedate the Tax Reform Act of 1986. Accordingly, the tax code sections referred to in this opinion are taken from the Internal Revenue Code of 1954, except where otherwise noted.

2. The term "patron" refers to those who transact their business with or through the cooperative.

A patron may be either a member (*i.e.,* a shareholder) or a nonmember. Treas.Reg. § 1.1388–1(e) (1990).

* The facts are taken from the parties' proposed findings and other undisputed factual material in the record.

Farm Bureau Federation and approved by the Landmark board of directors.

Landmark, like other cooperatives, is run on democratic principles. The managers and board of directors have frequent and continuing formal and informal contact with their members. The members receive annual financial reports and they are updated periodically on the condition of their cooperative. Each member has a financial stake in the organization.

Dealing with its members is Landmark's primary function. For the years 1978 through 1981, approximately 72 percent of Landmark's total business (both marketing and supply) was done with its 44 member organizations. For the taxable years in question, 95 percent of the members who marketed grain with Landmark also purchased supplies from Landmark.

During the relevant period, major products handled by the company included grain, feed, fertilizer, gasoline, fuel oil, diesel fuel, grease, lubricating oils, seeds, tools, livestock and poultry equipment, paint, tires, batteries, pesticides, animal health products, lawn and garden power equipment and supplies. Among the most important of these products was petroleum.

In the early 1970s, nationwide shortages in petroleum supply and the expected continuance of these conditions prompted Landmark to seek a long-term solution to its petroleum needs. Thus, in 1976, Landmark, along with seven other agricultural cooperatives, purchased a petroleum refining facility from the Atlantic Richfield Company and formed a new cooperative, Energy Cooperative, Inc. ("ECI").

Landmark was aware that the profitable operation of ECI was not a sure thing. Landmark's participation in the ECI venture was undertaken principally to assure its membership of an uninterruptable source of petroleum as opposed to seeking a return on invested capital.

The ECI venture proved economically unsuccessful. Thus, for its 1981 tax year Landmark claimed, as a deduction from income, the loss sustained from its activities with ECI. The amount of the claimed loss was $19,203,600, representing plaintiff's basis in its one share of common stock and certain shares of two classes of preferred stock of ECI.

Thereafter, the Internal Revenue Service examined plaintiff's returns for the tax years 1975 through 1981. The revenue agent assigned to the examination disallowed, in full, the $19,203,600 deduction for the ECI loss claimed by plaintiff on its 1981 return.

On September 7, 1984, plaintiff filed with the District Director, Cincinnati, Ohio, a written protest and requested a conference with the Internal Revenue Service Appeals Office. The protest specifically objected to the revenue agent's disallowance of the ECI loss.

Plaintiff's protest to the Appeals Office resulted in settlement of the ECI issue, as represented by the parties' execution of a Form 906 Closing Agreement. In the closing agreement the parties stipulated to a reduction of the ECI loss from the $19,203,600 originally claimed by plaintiff to a revised amount of $15,269,100. Of this revised amount 65 percent, or $9,924,915, was determined to be an ordinary loss while 35 percent, or $5,344,185, was determined to be a capital loss.

Of the $9,924,915 ordinary loss allowed under the closing agreement for the taxable year 1981, plaintiff was able to utilize only $3,288,650 as a deduction against that year's taxable income leaving, as a result, a 1981 net operating loss of $6,636,265. The attempted carryback of this latter figure gives rise to the issues we encounter here.

## DISCUSSION

*Section 277.*

■ The statute with which we begin, section 277 of the tax code, is concerned with social clubs and other membership organizations and, in particular, with the tax treatment to be accorded to losses incurred by such organizations in supplying goods and services to their memberships. The rule prescribed by the statute is that losses arising out of transactions for the benefit of members may only be set off

against member income and excess losses attributable to such transactions may only be carried forward. The statute reads in relevant part as follows:

(a) General rule.—In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members.... If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year.

In considering the applicability of section 277 to the case before us, we start, as does the Government, with the familiar rule that, in the construction of statutes, it is to be assumed that "the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Defendant asserts that plaintiff's organizational structure, its business operations and its tax status mark it as the paradigm of the entity described in section 277: a "membership organization ... operated primarily to furnish services or goods to members ... not exempt from taxation."

The Government adds to the argument that the intended application of section 277(a) to cooperatives in general is confirmed by those particular businesses which the statute goes on to exempt from its coverage. Paragraph (b) of section 277 exempts: mutual savings banks, mutual insurance companies, membership organizations with prepaid dues income, national securities and commodities exchanges and news gathering and distribution associations. All of these organizations, it is pointed out, are essentially membership organizations operating on a cooperative basis. Thus, to the Government the scope of the statute is clear: it reaches all membership organizations save those specifically

exempted. From the Government's point of view then, a decision in its favor can logically rest on the words of the statute alone.

Plaintiff stoutly opposes this approach to the issue. Section 277, says plaintiff, is hardly the model of statutory clarity which the Government claims it to be. It is argued, for example, that the phrasing "social club or other membership organization" implies a linkage between organizations of similar purpose. Therefore, to plaintiff the more natural reading of the phrase is "social club or other [like] membership organization." Plaintiff's argument, then, is that any broader or different meaning for the term "membership organization" would require confirmation in the statute's legislative history.

Plaintiff further contends that even if the words of the statute are considered free of ambiguity, a construction of section 277 that includes nonexempt cooperatives within its scope would transgress upon the comprehensive scheme of taxation set aside for nonexempt cooperatives in subchapter T of the code. Plaintiff urges us to avoid such an intrusion and to examine the legislative history of section 277 for guidance. That history, we are told, will make it clear that nonexempt agricultural cooperatives were not intended to be included among the membership organizations dealt with in section 277.

The court is aware that "going behind the plain language of a statute in search of a possibly contrary congressional intent is 'a step to be taken cautiously' even under the best of circumstances." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982) (quoting *Piper v. Chris–Craft Indus. Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977)). Nevertheless, we are persuaded to take that step here in deference to the argument plaintiff urges: the unlikelihood that Congress intended to include nonexempt, agricultural cooperatives among the membership organizations covered by section 277 given the unique scheme of taxation otherwise applicable to

such organizations. The proper evaluation of this argument requires us to go beyond the words of section 277. We turn, therefore, to the Tax Reform Act of 1969—the legislative source of section 277.

The Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487 (1969), *reprinted in* 1969–3 C.B. 10, was a major piece of tax legislation that undertook a comprehensive reform of the income tax laws. Among the many changes introduced by this law was an expansion of the definition of "unrelated business income" to include the passive investment income received by certain tax exempt organizations and, simultaneously, an extension of the unrelated business income tax to all tax exempt organizations. The purpose of these changes was to make taxable all income of tax exempt organizations that was not related to their exempt functions. *See* H.R.Rep. No. 413, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News 1969, p. 1645, *reprinted in* 1969–3 C.B. 200, 228–232.

At the time that these changes in tax law were under consideration, Congress also recognized that the intended result could easily be thwarted if the affected organizations decided to relinquish their tax exempt status in favor of operating as not-for-profit membership organizations. What prompted this concern was Congress' awareness that, under certain then-recent court decisions, nonexempt corporations organized to provide services to members on a nonprofit basis had been permitted to use their unrelated investment income to absorb losses incurred in their principal activities. In other words, income that otherwise would have been taxable was used to underwrite member expenses. Section 277 was enacted to overcome these court decisions and to preclude this possible evasion of the tax law.

A comprehensive explanation of section 277 is given in the report of the Committee on Ways and Means of the House of Representatives—the congressional committee responsible for the initiation of the legislative changes that later became the Tax Reform Act of 1969. The report states in pertinent part the following:

5. *Limitation on deductions of certain nonexempt membership organizations (section 121 of the bill and section 278 of the code)*

*Present law.*—Certain nonexempt corporations organized to provide services to members on a nonprofit basis realize investment income, or income from providing services to nonmembers, which is used to defray all or part of the cost of providing services to members. The courts have upheld this treatment in certain cases, although the effect is to render the investment income nontaxable, and therefore to permit untaxed dollars to be used by the organization to provide services for its members.

*General reasons for the change.*—This problem is similar to that discussed in paragraph 3 with respect to exempt social clubs, fraternal beneficiary societies, and voluntary employees' beneficiary associations. In fact, these organizations might attempt to avoid the effect of the changes made by your committee's bill in treating investment income and income received from nonmembers as unrelated business income, by giving up their exempt status and deducting the cost of providing services for members against this income.

*Explanation of provisions.*—Your committee's bill adds a new provision (sec. 278) [later renumbered sec. 277] which provides that in the case of a social club or other membership organization operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions in furnishing services, insurance, goods, and other items of value to members are allowable only to the extent of income from members or transactions with members. This provision does not apply to organizations that are taxable as banking institutions or insurance companies under the code. [H.R.Rep. No. 413, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News 1969, pp. 1694, 1695, *reprinted in* 1969–3 C.B. 200, 232.]

The concerns that prompted the Ways and Means Committee to propose the enact-

ment of section 277 were shared as well by the Committee on Finance of the United States Senate. In proceedings before this Committee, exceptions to proposed section 277 were enlarged to include securities and commodities exchanges and certain membership organizations receiving prepaid dues income. Additionally, a loss carryforward provision was added. However, the basic purpose and thrust of the law remained unchanged. The Senate Committee's views of the current law and the necessity for change were as follows:

5. *Limitation on Deductions of Nonexempt Membership Organizations (sec. 121(b) of the bill and sec. 277 of the code)*

*Present law.*—Certain nonexempt organizations which provide services to members on a nonprofit basis realize investment income, or income from providing services to nonmembers, which is used to defray all or part of the cost of providing services to members. Some courts have held that taxable membership organizations cannot create a "loss" by supplying their members services at less than cost. Other courts have held, instead, that such a "loss" is permissible, and that the expenses of providing such services at less than cost offset for tax purposes additional income earned by the organization from investments or other activities.

*General reasons for the change.*—In some cases, membership organizations, which also have business or investment income, serve their members at less than cost and offset this book loss against their business or investment income and as a result pay no income tax. In an important decision, it was held that a non-exempt water company was not subject to tax when the "losses" in supplying its members water offset its investment income. Other courts have held to the contrary. [S.Rep. No. 552, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News 1969, pp. 2103, 2104, *reprinted in* 1969-3 C.B. 423, 471.]

Then, by way of explaining the change proposed, the Committee wrote:

*Explanation of provision.*—Both the House bill and the committee's amendments provide that in the case of a taxable membership organization the deduction for expenses incurred in supplying services, facilities or goods to the members is to be allowed only to the extent of the income received from these members. The purpose is to prevent membership organizations from escaping tax on business or investment income by using this income to serve its members at less than cost and then deducting the book "loss." The purpose of the provision is to impose a limitation on the amount of deductions in a taxable year for items which are otherwise allowable as deductions in the case of the organizations and activities to which the provision is applicable, and is not intended to provide for the deduction of any item not otherwise deductible. [*Id.*]

Based on the above-referenced legislative history, the conclusion plaintiff would have us come to is that Congress, in its use of the term "membership organization" in section 277, had in mind only those types of organizations to which particular reference had been made, namely, voluntary associations (such as social clubs, fraternal societies and employee organizations) organized to supply goods and services to members on a nonprofit basis. Cooperatives, by contrast, are more complex business structures. They are organized as corporations, serve members as well as nonmembers ("patrons" is the collective term) and distribute dividends out of net earnings. In plaintiff's view then, nonexempt cooperatives are essentially different in structure, purpose, and mode of operation from the organizations addressed in section 277.

We cannot go along with this argument. Had Congress meant to limit membership organizations in the manner plaintiff suggests, then it would not have been necessary to exempt from the statute's coverage the particular businesses that are listed in paragraph (b). These businesses—mutual savings banks, mutual insurance companies, membership organizations with prepaid dues income and national securities and commodities exchanges—are all mem-

bership organizations operating on a cooperative basis. Congress' recognition that particularized exclusion was required in order to exempt a membership organization from section 277 is a clear indication that the statute was aimed at membership organizations in general.

The purpose of section 277, as its history plainly demonstrates, was to thwart the possibility of shifting the costs of member services to nonmember income, that is, reducing member costs at the expense of taxable income. This then brings us to the second branch of plaintiff's argument.

Plaintiff maintains that even if the legislative history fails to show that section 277 was not intended to apply to nonexempt agricultural cooperatives, nevertheless, such an interpretation of section 277 is required when consideration is given to the provisions of subchapter T. Subchapter T, we are told, renders moot the tax avoidance concerns that prompted the enactment of section 277. An understanding of plaintiff's argument requires a brief word of explanation about the tax treatment of nonexempt cooperatives and their patrons.

For purposes of federal income tax law, the gross income of nonexempt cooperatives is classifiable into two categories: patronage-sourced and nonpatronage-sourced. I.R.C. § 1382. The former identifies income realized by a cooperative in transactions with or for its patrons; the latter refers to income stemming from sources or activities not involving transactions with patrons. The importance of this distinction is that, under section 1382 of the code, a nonexempt cooperative is entitled to a tax free distribution of the profits realized from the business conducted with or for its patrons.[3]

Though referred to as patronage "dividends," these distributions to patrons are analytically perhaps better described as "corrective and deferred price adjustments" rather than as distributions out of profit. *See Pomeroy Coop. Grain Co. v. Comm'r*, 31 T.C. 674, 686 (1958), *rev'd on other grounds*, 288 F.2d 326 (8th Cir.1961). In either case, however, the significant point is that that portion of the nonexempt cooperative's gross income attributable to patronage activities is taxed only once—in the hands of the patrons. Thus, the business done by a cooperative with or for its patrons is essentially tax exempt.

We come now to plaintiff's argument. There are essentially two points. The first concerns the statutory requirements that a patronage dividend must satisfy in order to qualify for exclusion from gross income. Among these are requirements calling for a patron's distribution to be fixed both in terms of the "quantity or value of business done with or for such patron" and the "net earnings of the organization from business done with or for its patrons." I.R.C. § 1388(a). Thus, a patronage dividend qualifies as such only when it is paid out of the net earnings from patronage business and is proportionate to the patron's contribution to that business.

What this means in practical terms—and this is the point plaintiff makes—is that the patronage dividend exemption operates under ground rules that preclude the potential for abuse that section 277 was meant to arrest—self-dealing by members either at the expense of nonmember income or at the expense of unrelated (*i.e.,* taxable) business income.

To underscore its point, plaintiff refers us to the decision in *Farm Service Cooperative v. Commissioner*, 619 F.2d 718 (8th Cir.1980), a case involving a nonexempt agricultural cooperative's attempt to offset income realized from its taxable activities with losses arising out of its patronage

---

**3.** For the sake of completeness, we should add that the tax code also recognizes "exempt" cooperatives. Exempt cooperatives are those satisfying the criteria of section 521(b) of the code. Leaving qualifying requirements aside, the essential difference between exempt and nonexempt cooperatives lies in the treatment accorded their income. Whereas nonexempt cooperatives may allocate and deduct only income arising from business done with or for patrons, the exempt cooperative may allocate and deduct not only patronage-sourced income but also dividends on capital stock and earnings derived either from business done for the United States or from nonpatronage sources. Logan, *Federal Income Taxation of Farmers' and Other Cooperatives*, Parts I and II, 44 Tex.L.Rev. 250, 1269 (1965).

business (the raising of broilers). The court declared such an accounting practice to be prohibited. "[S]ubchapter T," said the court of appeals, "forbids a nonexempt cooperative to aggregate patronage losses with its income from taxable activities, if the two are separately calculated." A contrary ruling, the decision went on to say, would allow "any nonexempt cooperative . . . [to] avoid tax on nonpatronage-sourced income by the simple expedient of operating at a loss on its patronage activities." *Id.* at 727.

Based on these authorities—the statute and the case law—plaintiff makes the argument that superimposing section 277's requirements upon subchapter T cooperatives would secure no revenue interest not already protected by subchapter T. All that section 277 could add is its restriction against member loss carrybacks—a limitation of little importance given subchapter T's overall prohibition against aggregating patronage losses with nonpatronage income. The short of it is that plaintiff sees section 277's application to subchapter T cooperatives as unnecessary and therefore an application not reasonably attributable to Congress' purpose in enacting that section.

The other argument plaintiff makes again involves section 1388, this time paragraph (j). This paragraph, which was added to subchapter T in 1986, sets out special rules for the netting of gains and losses by cooperatives. The rule we are referred to appears in subparagraph (1):

> The net earnings of [a nonexempt cooperative] may, at its option, be determined by offsetting patronage losses (including any patronage loss carried to such year) which are attributable to 1 or more allocation units (whether such units are functional, divisional, departmental, geographic, or otherwise) against patronage earnings of 1 or more other such allocation units.

Put simply, subparagraph (1) authorizes intra-organizational netting of patronage earnings and losses.

The relevance of this provision to our case proceeds from the fact that patronage earnings and losses are, by definition, the earnings and losses of all those who transact their business with or through the cooperative—members and nonmembers alike. Thus, subparagraph (1) expressly sanctions that which section 277 would prohibit, *i.e.*, aggregating member losses with nonmember income.

To be sure, section 277's purpose in prohibiting aggregation is to foreclose the subsidizing of member costs at the expense of taxable income whereas the aggregation of earnings and losses permitted by subparagraph (1) affects only potentially non-taxable income (*i.e.*, patronage income). The point remains, however, that if Congress had intended section 277 to be taken at face value, (that is, to be applicable to all membership organizations) then section 277 would be in open conflict with subparagraph (1), presumably necessitating, therefore, some words of acknowledgment and reconciliation from Congress.

However, neither paragraph (j) nor its legislative history evidence any legislative awareness of conflict. Indeed, what we do find in the legislative history cuts the other way. The Senate committee's report on the bill containing the netting provision that later became paragraph (j) contains the following statement:

> The committee intends that these provisions do not affect a cooperative's ability to use net operating loss deductions available under present law. Moreover, the committee intends no inference regarding the treatment under present law of the offsetting of patronage earnings and losses other than patronage losses. Nevertheless, the committee approves of the result in *Farm Service Cooperative v. Comm'r*, 619 F.2d 718 (8th Cir.1980), which held that a nonexempt cooperative could not offset patronage losses against nonpatronage earnings. [S.Rep. No. 146, 99th Cong., 2d Sess. 377 (1986), *reprinted in* 1986–3 U.S.Code Cong. & Admin.News 42, 336.]

In plaintiff's reading of it, the above-referenced legislative history demonstrates a distinct awareness on the Senate committee's part of the state of the law governing

a cooperative's right to loss carryback treatment and the constraints imposed on cooperatives against shifting patronage losses to nonpatronage income. That section 277 is not at all mentioned in this context is to plaintiff persuasive evidence that that section was never understood to apply to cooperatives subject to subchapter T.

Is plaintiff correct in this conclusion? We think so. Granted, when taken at face value, the words of the statute are plainly sufficient to bring nonexempt cooperatives within their scope. Moreover, nothing appearing in the legislative history of section 277 detracts from such a conclusion.

The stumbling block to applying section 277 in the present setting lies in the comprehensiveness of the taxing scheme that is prescribed for cooperatives in subchapter T. To superimpose section 277 on nonexempt cooperatives operating under subchapter T would (i) intrude upon an existing statutory framework that already secures the basic concerns of section 277 (patronage losses may not be aggregated with nonpatronage income), (ii) force an artificial distinction to be drawn between member and nonmember patronage losses (only the latter could be carried back), and (iii) result in a conflict with the later-enacted provisions of section 1388(j). Thus, when seen in this broader context, literal adherence to the words of section 277 would produce results that extend from legislative redundancy to a repeal by implication. These are not results we can reasonably suppose Congress meant to achieve.

This, then, becomes one of those occasional cases in which a court's search for the intention of a statute must take into consideration not only the meaning of the words used but the result of their application to the general subject of which they form a part. The aim, of course, is to give the statute its fullest meaning without at the same time attributing to Congress an unspoken intention to displace or modify existing law, especially where the existing law represents a specialized treatment of a particular subject. "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976).

■ Accordingly, based on these considerations of legislative harmony, we see this case as one in which the tax treatment for the losses in question is governed by the specific provisions of subchapter T and the case law construing those provisions and not by the more generalized rule set out in section 277. Therefore, under the terms of code section 172, plaintiff is entitled to carryback the 1981 net operating loss associated with its refinery investment. In doing so, however, it may not merge patronage and nonpatronage-sourced gains and losses.

*Section 46(h).*

■ The carryback of its 1981 net operating loss to the preceding three year period (1978–1980) results in a reduction of the net earnings originally reported in those years and, simultaneously, a freeing-up of the investment tax credits that had been claimed against the taxes otherwise due on those earnings. This brings us, therefore, to the second issue in this case: whether Landmark may retain these investment tax credits and utilize them as offsets against preceding years' income or is required to pass them on to its patrons. The answer turns on the interpretation to be given to section 46(h) of the tax code.

During the years in suit, section 46(h) read as follows:

(h) Special rules for cooperatives

In the case of a cooperative organization described in section 1381(a)—

(1) that portion of the credit allowable to the organization under section 38 which the organization cannot use for the taxable year to which the qualified investment is attributable because of the limitation contained in subsection (a)(3) shall be allocated to the patrons of the organization. . . .

In substance, the statute provides that that portion of the investment tax credit which a cooperative is unable to claim because of statutory limitations is to be passed on to the organization's patrons. Thus, the question we encounter here is whether this "pass-through" requirement applies to investment tax credits previously claimed by the cooperative but subsequently displaced, *i.e.,* freed-up, because of loss carrybacks that eliminated the income tax liability against which those credits originally had been applied.

Plaintiff's position is that the statute does not apply to the facts of this case. To start with, plaintiff maintains that the "taxable year" referred to in section 46(h) is the year in which a cooperative first made a qualified investment in, or purchased and placed into service, property eligible for an investment tax credit. Thus, to plaintiff, the statute does not focus on any year other than the year in which the cooperative purchased and placed into service credit-eligible property. Therefore, the argument continues, once determined, the allocation of investment tax credits between cooperative and patron is forever fixed—a credit assigned to the cooperative remains with the cooperative.

Plaintiff further argues that the legislative history of section 46(h) supports the position it is asserting here. That history, we are told, reflects a congressional understanding that freed-up investment credits were not addressed by section 46(h) and, in addition, that such credits would remain available for use by the cooperative either as carrybacks or carryforwards.

These arguments have no merit. First, as to the wording of the statute, it is not a reasonable reading of section 46(h) to say that the term "taxable year" is exclusively a reference to the year in which a cooperative's share of the investment credit is first determined. Granted, the operation of the statute would first come into play in the year in which qualified investment property is put into service. However, the pass-through requirement of the statute is not restricted to just the first year. The statute refers to "the taxable year *to which*

*the qualified investment is attributable"* (emphasis added); hence, by its very terms, it applies *whenever* the tax liability for that year is under consideration.

Not only does the language of the statute require rejection of plaintiff's position but so too does the concept that is fundamental to our tax structure—the annual accounting period. Adherence to this tenet requires that, in the recomputation of a prior year's taxes by incorporation of a later year's losses (the carryback situation), the taxpayer must recalculate the prior year's tax liability in its entirety. That is, start anew. A taxpayer is not permitted to selectively blend the tax years involved. This rule was established long ago in *Commissioner v. Van Bergh,* 209 F.2d 23, 25 (2d Cir.1954), where Judge Learned Hand wrote:

> [W]e can see no reason to suppose that, when Congress decided to allow the loss [under section 172] to be treated as though it had in fact occurred in the earlier, or later, year, it did not mean it to be so treated for all purposes. If this is not true, it will result that the taxpayer will be put in a better position, when the loss occurs in a later, or an earlier, year, than when it occurs in the year when it is allowed as a deduction. That obviously cannot have been the intention.

To the same effect, see also *Motor Insurance Corp. v. United States,* 208 Ct.Cl. 571, 581, 530 F.2d 864, 870 (1976), where the court held that the carryback of a net operating loss under section 172 required the taxpayer to completely recompute its tax liability for the carryback year in order to determine its foreign tax credit for that year.

As to the argument plaintiff makes about legislative history, there is little that needs to be said. The various references to which plaintiff has directed our attention concern a proposed Senate amendment that would have allowed cooperatives to elect whether or not to pass on to their patrons unused investment tax credits. However, the proposed amendment was not adopted—section 46(h)'s pass-through provision is mandatory, not elective—and

therefore plaintiff's various assertions are all beside the point. They warrant no further comment.

We conclude that the investment tax credits previously claimed by Landmark in the tax years 1978–1980, and since displaced by losses carried back to those years, must be passed on to Landmark's patrons. That is the mandate of section 46(h).

### CONCLUSION

For the reasons set forth herein, we grant in part and deny in part the parties' respective motions and cross-motions. Plaintiff prevails on the section 277 issue; defendant prevails on the section 46(h) issue. Since plaintiff may not carryback its investment credits, no refund of prior years' taxes is due.

The Clerk is directed to enter judgment dismissing the complaint.