FARM CREDIT SERVICES OF NORTHWEST NORTH DAKOTA, ACA, f.k.a. PRODUCTION CREDIT ASSOCIATION OF MINOT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Farm Credit Servs. v. Commissioner
Docket No. 8084-93.
United States Tax Court
T.C. Memo 1995-436; 1995 Tax Ct. Memo LEXIS 435; 70 T.C.M. (CCH) 655; September 11, 1995, Filed *435 Decision will be entered for petitioner. George W. Benson and David J. Duez, for petitioner. David L. Zoss, for respondent. SCOTT, Judge SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the calendar years 1979 through 1984 as follows: Year
Deficiency
1979
$ 11,217
1980
110,107
1981
156,030
1982
248,083
1983
130,496
1984
133,627
These deficiencies result from a determination by respondent that the allowance of loss carrybacks by a predecessor of Farm Credit Services of NorthwestNorth Dakota from 1985 to 1982, 1983, and 1984, thus permitting carrybacks of investment tax credits no longer needed in those years to 1979, 1980, and 1981, was in error. The issue for decision is whether Production Credit Association of Minot, a production credit association, which was a predecessor of Farm Credit Services of NorthwestNorth Dakota, is prohibited by section 277[1] from carrying back its 1985 net operating loss. *436 In order to decide this issue it is necessary to determine whether Production Credit Association of Minot is a membership association which primarily furnishes goods or services to its members within the meaning of section 277. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of the petition in this case, Farm Credit Services of NorthwestNorth Dakota (Farm Credit Services) had its principal place of business in Minot, North Dakota. Farm Credit Services is an agricultural credit association incorporated under the Farm Credit Act of 1971, Pub. L. 92-181, 85 Stat. 583, as amended. It is the result of a merger between the Production Credit Association of Minot (which we will hereinafter refer to as petitioner since it is the one of the merged organizations whose taxes were adjusted) and the Federal Land Bank Association of Northwest North Dakota, which occurred on March 31, 1989. Petitioner was incorporated on January 17, 1934, as a production credit association pursuant to title II of the Farm Credit Act of 1933, with its stated purpose being, among other things, "to make loans to farmers for general agricultural purposes." *437 At all times relevant to this case petitioner had its principal office in Minot, North Dakota. Petitioner timely filed its Federal income tax returns for the taxable years 1979 through 1984 with the office of the Internal Revenue Service in Ogden, Utah. During the taxable years at issue, petitioner operated as a production credit association pursuant to the Farm Credit Act of 1971. During the years at issue, petitioner was one of over 400 production credit associations located throughout the United States. Petitioner operated through a main office located in Minot, North Dakota, and four branch offices located in Williston, Bottineau, Rugby, and Carrington, North Dakota. Petitioner operated through five offices because the territory it served was quite large, necessitating branch offices. During the taxable year 1985, petitioner had approximately 65 employees. Beginning October 1, 1985, petitioner and the Federal Land Bank Association of Northwest North Dakota entered into a joint management arrangement. Under that agreement, they shared office space and employees, but each kept its separate corporate identity, and petitioner continued to file separate Federal income tax returns. *438 The purpose of joint management was to achieve greater efficiencies. The Federal Land Bank Association of Northwest North Dakota and petitioner conducted business under the name Farm Credit Services of Minot. Under the Farm Credit Act of 1971, section 2.15(a), 85 Stat. 601, petitioner was authorized to do the following: make, guarantee, or participate with other lenders in short- and intermediate-term loans and similar financial assistance to (1) bona fide farmers and ranchers and the producers or harvesters of aquatic products, for agricultural purposes and other requirements of such borrowers, (2) rural residents for housing financing in rural areas, under regulations of Farm Credit Administration, and (3) persons furnishing to farmers and ranchers farm-related services directly related to their on-farm operating needs.* * *
A person was considered to be a "bona fide farmer" if 50 percent of his or her income came from farming. Most of petitioner's loans were to farmers for agricultural purposes. Petitioner participated in a few commercial bank loans to farmers. Petitioner made a few loans to persons furnishing farmers with farm-related services that were directly related *439 to their on-farm operating needs. From 1979 through most of 1985, petitioner lent money to farmers located in a 16-county area in northwest North Dakota. As of December 1, 1985, a 17th North Dakota county, McKenzie, was added to petitioner's service area. Most farming businesses in these counties were conducted as sole proprietorships. Most of the farms in this area were engaged in either small grain production or cow/calf operations. A typical farm in this area was approximately 1,200 acres. Production, or operating, loans were short-term loans to finance the cost of raising a crop or feeding livestock. These loans were normally due within 1 year. Production loans were used by farmers to pay for fuel, fertilizer, seed, and other expenses of raising a crop or the costs of feeding livestock. These loans were paid off when the crop or livestock was sold. These loans were typically secured by crops, farm machinery, or livestock. Term loans were loans to purchase machinery, livestock, or farm-related assets, other than land, with a useful life longer than 1 year for use for agricultural purposes. The maximum length of the term loans that petitioner made was 7 years. Term loans were *440 often secured by the asset purchased. When a prospective borrower requested a loan, petitioner required that he or she complete an application that asked for detailed financial information. After the application was completed, petitioner analyzed the information contained in the application to determine whether the prospective borrower's anticipated cash-flow would be sufficient for timely repayment of the loan, and whether the available collateral was adequate. Petitioner would then investigate the credit history of the prospective customer to determine the customer's credit-worthiness. Once petitioner had completed its analysis of the application, it decided whether or not to make the loan. Depending on the size and complexity of the prospective loan, the lending decision was made by either a loan officer, a branch manager, a credit committee, or the Federal Intermediate Credit Bank in St. Paul. Lending decisions were normally made within 1 to 7 days, with decisions on large loans requiring higher levels of review taking longer than decisions on smaller loans that were approved by a loan officer or a branch manager. When a loan application was declined, the applicant was normally *441 sent a letter informing the applicant that the loan had been declined, stating the reason for the denial and describing the applicant's appeal rights. An applicant had certain appeal rights if the applicant thought that credit had been unfairly denied. When a loan was approved, a credit officer was responsible for assuring that the correct papers were prepared to document the loan and to perfect petitioner's security interest in any collateral. Petitioner had both a long form and a short form basic loan agreement. Various papers were used to perfect petitioner's security interest in collateral. When the loan documentation was completed, the loan would be closed and the funds disbursed. Once the loan funds were disbursed, the loan was entered into petitioner's accounting system so that the borrower would be billed when appropriate. A credit officer normally was not actively involved in monitoring a loan after it was made, unless the loan was large or had been identified as a problem loan. The procedures for approving and processing loan renewals were essentially the same as the procedures for new loans, except that the investigation of the borrower's history did not need to be as *442 extensive. If a borrower missed a payment or petitioner had reason to be concerned about the repayment prospects of the loan, the loan was characterized as a problem loan. For all problem loans, a loan service plan was prepared outlining petitioner's general philosophy with respect to the loan, the condition of the collateral, and a plan for handling the loan so that the loan would eventually be upgraded or repaid. Petitioner sought to work with borrowers to return problem loans to acceptable credit standards. If it appeared that a problem loan would not eventually be upgraded, but the borrower was cooperating with petitioner, the loan was classified as a workout loan. The objective was to gradually reduce the balance of the workout loan over a 1- to 3-year period. If it appeared that a problem loan would not eventually be upgraded and the borrower was not cooperating, the loan was classified as a collection loan. The objective of petitioner was to get out of collection loans as quickly as possible using the collection alternatives at its disposal. Any collateral received in a foreclosure was classified as acquired property and sold, sometimes on a contract basis, as part of the *443 loan collection process. Foreclosed property was sold to whoever was willing to buy it. Petitioner pursued collection on loans in default as long as the costs of collection did not outweigh the prospects of recovery. Petitioner described the activities it engaged in with respect to each loan to ensure collection as "loan servicing". These activities included billing and collecting interest and principal, checking collateral, monitoring the loan, and work-out and collection efforts. Petitioner's loan collection process, loan approval process, loan documentation process, loan processing times, procedures for dealing with troubled loans, and lending practices were, in general, comparable to those of commercial banks making loans to farmers in northwest North Dakota. Petitioner did not give its borrowers advice on how to conduct farming operations or how to market crops. Loan officers for petitioner were cautioned not to become involved in the management of the farms of borrowers, but rather to deal with borrowers on an arm's-length basis to avoid jeopardizing petitioner's chances of collection should the borrower default on the loan. Petitioner actively sought new borrowers. It advertised *444 in local papers and on the radio and television, sought referrals from existing customers and from machinery suppliers, and reviewed the credit bulletins to identify potential customers. The purpose of the Farm Credit Act of 1971 was to improve income of farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them. In line with this purpose, production credit associations were obligated to set interest rates at the lowest reasonable cost taking into account the cost of funds, necessary income, and expenses. Petitioner charged interest on its loans at a competitive rate, but not always the lowest rate charged in its area. Its interest rates were generally equal to rates charged by other lending institutions in northwest North Dakota for comparable loans. Petitioner's only compensation for loans was interest charged for the money lent. It had no separate charge for the time spent processing and handling loans. Petitioner's share of the farm production loan market in northwestern North Dakota during the years in issue was between 20 and 25 percent. Initially petitioner's business was only making loans, but starting in November 1983 *445 petitioner offered borrowers the option of financing farm equipment, machinery, and grain storage facilities under a farm equipment lease program. Under the farm equipment lease program, petitioner purchased the farm equipment needed by a farmer and leased it back to the farmer. Petitioner determined whether to enter into a farm equipment lease with a farmer in the same manner it determined whether it would make a term loan to a farmer to purchase equipment which would serve as collateral for the loan. Under the terms of the farm equipment lease, the farmer was entitled to purchase the leased property at the end of the lease term at a percentage of the original equipment cost established at the origination of the lease. Leases under the farm equipment lease program qualified as farm finance leases for tax purposes under section 168(f)(8) (as in effect at that time) so that petitioner, rather than the farmer, was treated as the owner of the leased property for tax purposes and, thus, was entitled to depreciate the property and to claim any investment tax credit. This tax deduction arrangement enabled petitioner to offer farmers financing on farm equipment at a reduced rate. In addition *446 to providing loans to farmers, petitioner was authorized by the Farm Credit Act of 1971, section 2.16, 85 Stat. 602, to do the following: provide technical assistance to borrowers, applicants, and members and may make available to them at their option such financial related services appropriate to their on-farm operations as is determined feasible by the board of directors of each district bank, under regulations prescribed by the Farm Credit Administration.
Pursuant to this authority, petitioner provided borrowers with the option of purchasing certain kinds of insurance through insurance programs it sponsored, with farm recordkeeping assistance, and with tax return preparation assistance. Petitioner's loans to borrowers sometimes required that credit life or key-man insurance be maintained in the amount of the loans to assure repayment in the event of the death of the borrower. Petitioner's loans to borrowers sometimes required that hail or all-risk insurance be purchased to protect petitioner's collateral and to thereby assure repayment. Petitioner offered its borrowers the option of purchasing credit life, hail, or all-risk insurance through insurance programs it sponsored. *447 While petitioner sometimes required that a borrower purchase insurance as a condition of the loan, it did not require that the insurance be purchased through its programs. Petitioner was not the insurer under its programs, but rather it sold insurance offered by several insurance companies. Petitioner sold credit life insurance only to borrowers. Hail insurance and multiperil insurance were sold to borrowers, to landlords whose tenants were borrowers, and, in a few instances, to borrowers of the Federal Land Bank Association of Northwest North Dakota. Commercial banks lending to farmers in northwest North Dakota offered similar credit life insurance programs, and, depending on their size and their authority, offered similar hail and multiperil insurance programs. Petitioner, at least from 1979, also offered borrowers an electronic farm recordkeeping system known as "Agrifax", as well as tax planning and preparation assistance. Under the Agrifax system, petitioner would process data provided by farmers and produce standardized farm records for a set fee. The Agrifax system helped farmers prepare records which the farmers could then use in running their businesses. The Agrifax system *448 also produced standardized records which were of assistance to petitioner in monitoring the status of its loans. Petitioner did not advertise the availability of the Agrifax system to the general public. When a nonborrower used the system, the nonborrower was required to purchase a share of stock or a participation certificate. For a fee, petitioner prepared tax returns. When returns were prepared for a nonborrower, the nonborrower was required to purchase a share of stock or a participation certificate. During the years at issue, petitioner had approximately 450 to 550 customers of Agrifax and approximately 250 to 450 tax return preparation customers. Petitioner ceased offering Agrifax and tax return preparation in 1985 when the key individual involved in this activity left petitioner and went into business for himself. Petitioner's principal business activity was making loans to farmers. During the years at issue, petitioner had over 2,000 borrowers each year, and its average loan volume exceeded $ 120 million annually. Interest earned on loans was $ 16,569,600 in 1984. Agrifax income and tax service income were $ 200,588 and $ 95,380, respectively, in 1984. In 1984, credit *449 life insurance gross premiums collected totaled $ 429,000 and credit life insurance income was $ 109,050. In 1984, hail insurance gross premiums collected totaled $ 2,200,000, all-risk insurance gross premiums collected totaled $ 480,428, and hail and all-risk insurance income totaled $ 602,702. In 1983, 23 leases were closed totaling approximately $ 1 million, and, in 1984, 54 leases were closed totaling approximately $ 1.5 million. Petitioner was organized with capital stock. During the years relevant to this case, petitioner had issued and outstanding shares of class A nonvoting stock (through 1980), shares of class B voting stock, and participation certificates. Petitioner had authority to issue class C preferred stock, but no shares of class C preferred stock were issued or outstanding during the years here relevant. Petitioner had authority to pay dividends on its outstanding shares of both class A nonvoting stock and class B voting stock, and on participation certificates. Petitioner paid dividends on shares of class A nonvoting stock for the years 1978 through 1980. Petitioner's bylaws provided for the payment of patronage dividends to borrowers, if prior to the start of *450 a fiscal year the board of directors adopted a resolution obligating petitioner to pay patronage dividends. The board of directors never adopted such a resolution, and petitioner never paid a patronage dividend. During each of the years at issue, petitioner filed Forms 1120, U.S. Corporation Income Tax Returns. Petitioner did not claim any special tax status, and it paid tax on its taxable income each year as an ordinary corporate taxpayer. Petitioner was not exempt from income taxes under subchapter F or any other provision of the Internal Revenue Code. Petitioner was not a "corporation operating on a cooperative basis" within the meaning of section 1381(a)(2), and was not subject to and did not receive the benefits of subchapter T. Petitioner was not a social club. In the mideighties, petitioner experienced a significant deterioration in the quality of its loans. This decline culminated in substantial loan losses in 1985 and 1986, which petitioner deducted as worthless debts resulting in net operating losses in 1985 and 1986. The deterioration in the quality of petitioner's loans was primarily the result of a weakening of the farm economy during the mideighties, which made it *451 difficult or impossible for many of its borrowers to make payments when their loans became due. Farm income dropped, and the value of farm assets fell during this period. During the mideighties, commercial lenders to farmers in northwest North Dakota suffered losses similar to those suffered by petitioner. The production credit associations in the district in which petitioner was located and the St. Paul Federal Intermediate Credit Bank collectively incurred net losses of $ 159.7 million and $ 100.3 million in 1985 and 1986, respectively. The Federal land bank associations in the district in which petitioner was located and the Federal Land Bank of St. Paul collectively incurred net losses of $ 335.8 million in 1985 and $ 433 million in 1986. The losses incurred by petitioner were not intentionally generated by petitioner for tax or other reasons. They did not result from pricing loans or interest on loans below market. Borrowers from petitioner who were able to repay their loans did not benefit from the losses incurred by petitioner from bad loans, while the farmers whose loans were written off often lost all that they had invested in farming. Petitioner conducted its business *452 in essentially the same manner in 1985 as it had in prior years. The farmers whose loans gave rise to the loan losses in 1985 were the type of borrowers, and some were borrowers, with whom petitioner had done business for a number of years. Petitioner used the terms "borrower", "stockholder", and "member" to describe its customers. All borrowers, including leasing customers, were required to purchase and own either class B voting stock if they were ranchers or farmers, or participation certificates if they were not farmers or ranchers, in an amount equal to 10 percent of their outstanding loan balance. Participation certificates were issued when loans were made to persons who were not farmers or ranchers who took out loans to furnish farmers farm-related services. When petitioner participated in loans made by commercial banks to farmers, when petitioner sold hail or multi-peril insurance to a landlord or a borrower from the Federal Land Bank Association of Northwest North Dakota, or when petitioner provided Agrifax or tax preparation services for someone who was not a borrower, the customer was required to purchase a participation certificate. Most outstanding participation certificates *453 related to commercial bank loans in which petitioner participated. As a borrower paid off his or her loan from petitioner, the amount originally paid to purchase stock or a participation certificate was returned to him or her. [2] Only borrowers could hold class B stock. Article II, section 200 of petitioner's bylaws states that the "Members of the association shall include all holders of legal title to capital stock or participation certificates as evidenced on the books of the association, except the Governor and the bank." The persons defined as members did not get special loan rates, special treatment in loan processing, or special treatment if their loan became a problem loan. No person who was an eligible borrower was ever *454 refused a loan because he or she was not a shareholder. In fact, most borrowers did not become stockholders until the loan was approved and made to them. At that time, most of the borrowers purchased their stock with a portion of the borrowed funds. Only class B stockholders were permitted to vote at members' meetings. Each owner of class B voting stock was entitled to one vote, regardless of the number of shares held. A holder of a participation certificate, who was denominated a member under petitioner's bylaws, had no right to vote at members' meetings. All class B voting stock of petitioner was owned by either borrowers or lessees. All borrowers, lessees, all persons who purchased insurance through petitioner, and all persons who used Agrifax or had their tax return prepared by petitioner owned either class B voting stock or participation certificates and, thus, were members under petitioner's bylaws. Petitioner obtained its loan funds from its equity and from borrowing from the Federal Intermediate Credit Bank of St. Paul, 1 of 12 Federal intermediate credit banks nationwide which provided funds to production credit associations. The Federal Intermediate Credit Bank in turn *455 obtained capital by selling bonds in national markets. On its Federal income tax returns for its taxable years 1979 through 1984, petitioner reported taxable income and total tax paid each year as follows: Year
Taxable income
Total tax paid
1979
$ 562,948.48
$ 228,244.06
1980
889,375.82
364,445.53
1981
988,499.08
420,546.18
1982
625,252.00
248,583.00
1983
603,542.00
130,608.00
1984
673,710.00
133,650.00
On its tax return for 1985, petitioner reported total income of $ 14,027,238 and total expenses of $ 17,004,075. The expenses it reported were: Expense
Amount
Compensation of officers
$ 187,707
Salaries and wages
1,149,326
Bad debts
3,594,997
Taxes
123,346
Interest
10,328,650
Depreciation
759,138
Advertising
22,743
Employee benefits
78,592
Other deductions
759,576
The operating loss incurred by petitioner of $ 2,976,837 during its 1985 taxable year was the result of the bad debt deduction of $ 3,594,997. Petitioner filed Corporation Applications for Tentative Refund, Forms 1139, with the Internal Revenue Service claiming a carryback of its 1985 net operating loss to its 1982, 1983, and 1984 taxable years and carrybacks of investment *456 tax credits to its 1979, 1980, and 1981 taxable years. The net operating loss carrybacks from 1985 and the claimed refunds were as follows: Net operating
Refund
Year
loss carryback
claimed
1982
$ 625,252
$ 248,083
1983
603,542
130,496
1984
673,710
133,627
The investment credit carrybacks from 1982, 1983, and 1984 and the claimed refunds were as follows: Investment credit carrybacks and
refund claimed resulting
Tax year ended
from carrying back credits
12/31/79
$ 11,217
12/31/80
110,107
12/31/81
156,030
As required by section 6411, the amounts claimed on the Corporation Applications for Tentative Refund, Forms 1139, were refunded to petitioner. After examination of the returns and the applications for tentative refund described above, respondent issued a notice of deficiency to petitioner determining deficiencies in its Federal income taxes for the years 1979 through 1984 in the amounts of the previously allowed refunds resulting from carrying back the 1985 net operating loss and investment tax credits. In her notice of deficiency, respondent explained her determination of deficiencies as follows: Under section 277 of the Internal *457 Revenue Code, deductions incurred by certain membership organizations in transactions with members in excess of income derived from transactions with members are treated as paid or incurred in the succeeding taxable year. Since your organization meets the criteria set forth in section 277 of the Internal Revenue Code, the claimed net operating loss carrybacks from 1985 to 1982, 1983 and 1984 and the resulting carryback of freed investment credit to 1979, 1980 and 1981 are not allowed.
OPINION Section 277[3] was enacted to prohibit the use by certain nonexempt membership organizations of investment or nonmembership income to reduce charges for services, facilities, goods, insurance, or other valuable items furnished to members. Costs incurred in activities for the benefit of members may be deducted only to the extent of income received from members. Deductions that are otherwise allowable and that exceed income from members must be carried over to offset income received from members in future years and may not be carried back to prior years. Sec. 277(a). *458 The parties are in agreement that for section 277 to apply: (1) Petitioner must be a social club or other membership organization; (2) petitioner must be operated primarily to furnish services or goods to its members; and (3) petitioner must not be exempt from tax. The parties have stipulated that petitioner is not exempt from tax and that petitioner is not a social club, leaving for decision whether petitioner is a membership organization within the meaning of section 277, and whether petitioner operated primarily to furnish goods or services to its members. Petitioner contends that it was not a "membership organization" within the meaning of section 277 since it did not come within the intent of the section, which was enacted to prohibit corporations not exempt from tax from providing services to members at less than cost and using moneys received from non-members to defray, in part, the costs of the services provided to members. Petitioner further contends that it made loans to borrowers, who were sometimes called members, which was not the furnishing of goods and services to members within the meaning of section 277. Respondent's position is that petitioner is a "membership *459 organization" within the literal language of section 277 since it referred to its stockholders as members, and is not one of the organizations listed in section 277(b) as exempt from the provisions of section 277(a), and that making loans is a service. This is essentially the same argument made by respondent in Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547 (1994), which we rejected based on an analysis of the facts in that case. Therefore, we will proceed to analyze the facts in this case to determine whether section 277 is applicable to petitioner. Section 277 was enacted by section 121 of the Tax Reform Act of 1969 (TRA 69), Pub. L. 91-172, 83 Stat. 536, in connection with the extensive revisions made to the unrelated business income tax provisions (UBIT). As discussed more fully in Buckeye Countrymark, Inc. v. Commissioner, supra at 564-568, and Concord Consumers Housing Corp. v. Commissioner, 89 T.C. 105, 116-123 (1987), TRA 69 attempted to place nonexempt entities under the same rules as exempt entities by disallowing membership organizations the use of investment income *460 and nonmember income to offset the costs of providing goods and services to their members at a reduced cost or a loss. An explanation of the purpose of section 277 is given in the report of the Committee on Ways and Means of the House of Representatives, the pertinent part of which states as follows: 5. Limitation on deductions of certain nonexempt membership organizations (section 121 of the bill and section 278 of the code)
Present law.--Certain nonexempt corporations organized to provide services to members on a nonprofit basis realize investment income, or income from providing services to nonmembers, which is used to defray all or part of the cost of providing services to members. The courts have upheld this treatment in certain cases, although the effect is to render the investment income nontaxable, and therefore to permit untaxed dollars to be used by the organization to provide services for its members. [H. Rept. 91-413 (1969), 1969-3 C.B. 200, 232.]
The Committee on Finance of the U.S. Senate enlarged some of the exceptions to the proposed section 277, as well as adding a loss carryforward provision. The Senate Committee stated *461 the purpose of the statute as follows: 5. Limitation on Deductions of Nonexempt Membership Organizations (sec. 121(b) of the bill and sec. 277 of the code)
Present Law. --Certain nonexempt organizations which provide services to members on a nonprofit basis realize investment income, or income from providing services to nonmembers, which is used to defray all or part of the cost of providing services to members. Some courts have held that taxable membership organizations cannot create a "loss" by supplying their members services at less than cost. Other courts have held, instead, that such a "loss" is permissible, and that the expenses of providing such services at less than cost offset for tax purposes additional income earned by the organization from investments or other activities. General reasons for the change.--In some cases, membership organizations, which also have business or investment income, serve their members at less than cost and offset this book loss against their business or investment income and as a result pay no income tax. In an important decision, it was held that a non-exempt water company was not subject to tax when the "losses" in supplying *462 its members water offset its investment income. [4] Other courts have held to the contrary. Explanation of provision.--Both the House bill and the committee's amendments provide that in the case of a taxable membership organization the deduction for expenses incurred in supplying services, facilities or goods to the members is to be allowed only to the extent of the income received from these members. The purpose is to prevent membership organizations from escaping tax on business or investment income by using this income to serve its members at less than cost and then deducting the book "loss". The purpose of the provision is to impose a limitation on the amount of deductions in a taxable year for items which are otherwise allowable as deductions in the case of the organizations and activities to which the provision is applicable, and is not intended to provide for the deduction of any item not otherwise deductible. *463 [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 471.] The purpose of section 277, as the legislative history illustrates, is to prevent the shifting of the costs of member services to nonmember income by reducing member costs at the expense of taxable income. Farm Serv. Coop. v. Commissioner, 70 T.C. 145, 156 (1978), revd. on other grounds 619 F.2d 718 (8th Cir. 1980); Landmark, Inc. v. United States, 25 Cl. Ct. 100 (1992). Congress enacted the provisions of section 277 which are applicable to carryback of losses to apply to those losses which were generated by dealings with members in a manner to permit profits from commercial ventures, namely investment activities and business from nonmembers, to be passed on to their members free of tax. Farm Serv. Coop. v. Commissioner, supra.
None of the decisions in which this Court has considered section 277 have determined whether the phrase "membership organization" includes production credit associations. In Buckeye Countrymark, Inc. v. Commissioner, supra, Farm Serv. Coop v. Commissioner *464 , supra, [5] and Trump Village Section 3, Inc. v. Commissioner, T.C. Memo. 1995-281, this Court considered the applicability of section 277 to subchapter T corporations, which are corporations that are exempt farmers' cooperatives described in section 521 and "any corporation operating on a cooperative basis." [6] *465 In each case, we held that cooperatives that were subject to the provisions of subchapter T were not subject to section 277, since either the intent of section 277 would not be served, or applying section 277 to subchapter T organizations would undermine subchapter T's comprehensive nature. [7]
Two opinions of this Court addressed the scope of the term "membership organization" under section 277 as applied to entities that were not subchapter T organizations. [8] In Armour-Dial Men's Club, Inc. v. Commissioner, 77 T.C. 1 (1981), affd. 708 F.2d 1287 (7th Cir. 1983), the taxpayer provided social and recreational activities at or below cost to members who were required to pay annual membership dues. The taxpayer received the majority of its income from the profits generated by the taxpayer's retail store and from interest and vending machine income. We held that the taxpayer was a membership organization subject to section 277 and limited its deductions for membership activities by the amount of membership income. *466 In Associated Master Barbers & Beauticians of America, Inc. v. Commissioner, 69 T.C. 53 (1977), the taxpayer provided such services as hospitalization insurance, malpractice, and personal liability insurance to its members. Along with membership dues, the taxpayer also received income from sales of books which were sold to both members and nonmembers. We held that section 277 was applicable where the taxpayer's member income was exceeded by its member expenses, and the resulting loss was then offset by investment income. At least one other court has upheld the applicability of section 277 where the organization provided benefits for its members while offsetting membership income with investment or nonmember activities. In Boating Trade Association v. United States, 35 AFTR 2d 75-1228, 75-1 USTC par. 9398 (S.D.Tex. 1975), the taxpayer was a boating association that rented space at its annual boat show. The court held that section 277 was applicable where members were charged a deposit to rent floor space at the boat show that was refunded to them, while nonmembers were charged a fee that was not refunded. *467 In the cases that have held that the taxpayer qualified as a membership organization, none involved a taxpayer that offset income of prior years from member activity by a loss carryback. In each instance, the taxpayer had either investment or nonmember income which was used in the same year received to offset a loss from providing goods and services to its members in that year. These holdings are consistent with the policy behind section 277, which was enacted to disallow such offsets. Petitioner, in disputing that it was a membership organization, first relies on the definition of membership organization from section 456(e)(3). Petitioner argues that section 277 is inapplicable on the basis that section 277(b)(2) references section 456(c). Petitioner buttresses this argument by examining the common usage of the term "membership organization" under various State statutes, which frequently require that membership organizations have no capital stock and be exempt from taxation. Without addressing many of petitioner's arguments, we conclude that petitioner is not a membership organization for purposes of section 277. The legislative history of section 277 makes it clear that section *468 277 was enacted to apply the rules pertaining to the UBIT to nonexempt organizations in order to prevent nonexempt organizations from using investment income and income from nonmembership activities to offset losses from providing goods or services to members. We find this purpose would not be served by applying section 277 to petitioner. Petitioner was an organization that provided loans to its members at rates that were comparable to those charged by local banks. Its members were required by statute to be farmers, ranchers, rural residents, or persons furnishing farm-related services to farmers or ranchers. The loans petitioner provided were either short-term loans to finance the costs of raising crops or feeding livestock, or were term loans for farmers to purchase assets used for agricultural purposes. Both types of loans were secured by the crop, the livestock, or the asset purchased. The other services it provided its members, such as Agrifax and its insurance and leasing programs, were offered to compete with local banks that were offering these same services. The loans petitioner provided its members generated income for all of the years relevant prior to 1985, and petitioner *469 had no investment income for any of the years at issue. Petitioner's loss in 1985 was a result of defaults and late repayments by its members due to low commodity prices. The loss did not result from pricing loans or interest on loans below market, and its borrowers who had outstanding loans did not benefit from the losses incurred by petitioner. Persons who received loans or services from petitioner were designated members by receiving either stock or participation certificates. Members did not receive special loan rates, special treatment in loan processing, or special treatment if their loans became problem loans. An eligible borrower was not refused a loan because he or she was not a shareholder, but was required to become a shareholder upon approval of the loan. The only privilege bestowed upon a nonshareholder member was the right to attend and speak, but not vote, at members' meetings. Class B stockholder borrowers were the only voting "members". In one sense of the word, petitioner generally did not make loans to members but only to nonmembers and, therefore, would not be a "membership organization" that had any substantial transactions with its members. As a loan was paid *470 off, generally the class B stock or participation certificate the borrower was required to purchase was paid off, so that when that person applied to borrow again, he or she was not a member. Therefore, there were no "members" to which petitioner could furnish services or goods at less than cost. The fact that clearly distinguishes the instant case from the prior cases that have held section 277 applicable, and from circumstances contemplated by the legislative history, is the relationship between the members and nonmembers. In the instant case, essentially there were either no members or no nonmembers. Anyone who received a loan from petitioner was required to become a member, but until the loan was approved, generally the proposed borrower was not a member. Therefore, everyone who was provided a loan by petitioner was in the same position and received the same services and benefits, while no privilege came to members while they were paying off their loans. Respondent argues that Anaheim Union Water Co. v. Commissioner, 321 F.2d 253 (9th Cir. 1963), affg. in part and revg. in part 35 T.C. 1072 (1961), the case which prompted *471 the adoption of section 277 and is discussed in the legislative history of section 277, is not materially distinguishable from the present case. However, in Anaheim Union Water Co., the company used investment income to sell water to its farmer members at substantially less than cost. In the present case, the loss incurred by petitioner was incurred in the course of providing loans to borrowers who then became members of petitioner. The loss was incurred because of poor economic conditions in farming and not because any service was furnished to anyone at less than cost or at a reduced price. It is clear that the fact pattern in the Anaheim Union Water Co. case is materially different from that in the instant case. In the prior cases where we have considered section 277, we have consistently held that section 277 applies where nonmember or investment income has been used to offset costs to members. Concord Consumers Housing Coop. v. Commissioner, 89 T.C. 105 (1987); Armour-Dial Men's Club, Inc. v. Commissioner, 77 T.C. 1 (1981); Associated Master Barbers & Beauticians of America, Inc. v. Commissioner, 69 T.C. 53 (1977). *472 The legislative history clearly confirms that to broaden the scope of section 277 would be inconsistent with its purpose. Based on the facts in this record, we conclude that petitioner was not a membership organization primarily operated to furnish services and goods to members within the meaning of section 277. Decision will be entered for petitioner.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. The testimony in the record is that if, as occasionally happened, a class B stockholder wished to remain a stockholder after his or her loan was repaid, he or she could convert his class B stock to class A stock. However, petitioner's records show no class A stock outstanding after 1980.↩
3. SEC. 277. DEDUCTIONS INCURRED BY CERTAIN MEMBERSHIP ORGANIZATIONS IN TRANSACTIONS WITH MEMBERS. (a) General Rule.--In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members (including income derived during such year from institutes and trade shows which are primarily for the education of members). If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year. The deductions provided by sections 243, 244, and 245 (relating to dividends received by corporations) shall not be allowed to any organization to which this section applies for the taxable year. (b) Exceptions.--Subsection (a) shall not apply to any organization-- (1) which for the taxable year is subject to taxation under subchapter H or L, (2) which has made an election before October 9, 1969, under section 456(c) or which is affiliated with such an organization, or (3) which for each day of any taxable year is a national securities exchange subject to regulation under the Securities Exchange Act of 1934 or a contract market subject to regulation under the Commodity Exchange Act.↩
4. Anaheim Union Water Co. v. Commissioner, 321 F.2d 253 (9th Cir. 1963), affg. in part and revg. in part 35 T.C. 1072↩ (1961).
5. In Farm Serv. Coop. v. Commissioner, 619 F.2d 718 (8th Cir. 1980), revg. 70 T.C. 145 (1978), the Court of Appeals for the Eighth Circuit, the circuit to which this case is appealable, did not address the issue of whether sec. 277↩ applied but rather reversed this Court on the issue of whether the taxpayer utilized a proper method of determining gross income under subch. T.
6. For a more detailed discussion of subch. T organizations, see our discussion in Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 554-563↩ (1994).
7. Landmark, Inc. v. United States, 25 Cl. Ct. 100 (1992), also held that sec. 277↩ was inapplicable to subch. T cooperatives.
8. In Concord Consumers Housing Coop. v. Commissioner, 89 T.C. 105 (1987), we did not address the issue of whether the taxpayer was a membership organization for purposes of sec. 277 but held that investment income constitutes nonmembership income. In Washington-Oregon Shippers Cooperative, Inc. v. Commissioner, T.C. Memo. 1987-32, we did not reach the issue of whether sec. 277 applied to the taxpayer, since we held that interest income did not constitute patronage-sourced income under subch. T. We did note, however, that where the taxpayer charged its members for freight services at above cost, "[this] fact pattern * * * does not come within the general intendment of section 277↩."